PALMER OIL CORP. et al v. PHILLIPS PETROLEUM CO. et al.

STERBA et al. v. CORPORATION COMMISSION et al.

Nos. 33336, 33708.   March 20, 1951.

Petitions for Rehearing Denied May 22, 1951.

Applications for Leave to File Second Petition for Rehearing Denied June 5, 1951.

*231 P. 2d 997.*

Claude Monnet, Coleman Hayes, and Mart Brown, Oklahoma City, and Mark H. Adams, Charles E. Jones, and Wm. I. Robinson, Wichita, Kan., for plaintiff in error Palmer Oil Corporation.

Hatcher & Bond, Chickasha, and Jack W. Page, Oklahoma City, for plaintiffs in error Tom Potter et al.

Harry D. Page and Booth Kellough, Tulsa, for defendant in error Amerada Petroleum Corporation.

Brown, Darrough & Ball, Oklahoma City, for defendant in error Anderson-Prichard Oil Corporation.

Wm. C. Liedtke, Russell G. Lowe, Redmond S. Cole, Cyrus L. Billings, James B. Diggs, Jr., and Charles L. Follansbee, Tulsa, for defendant in error Gulf Oil Corporation.

Walace Hawkins, Dallas, Tex., and W. R. Wallace, Oklahoma City, for defendant in error Magnolia Petroleum Company.

Don Anderson, Oklahoma City, for defendants in error Stephens Petroleum Company and Ray Stephens, Inc.

Don Emery, Oklahoma City, Rayburn L. Foster, R. B. F. Hummer, and R. M. Williams, Bartlesville, and Harry D. Turner, Oklahoma City, for de-

fendant in error Phillips Petroleum Company.

George W. Hazlett, Cleveland, O., Villard Martin and Wilbur Heard, Tulsa, R. M. Williams, Chas. B. Ellard, A. B. Tanco, Dallas, Tex., Forrest M. Darrough, J. H. Crocker, M. Darwin Kirk, and T. Murray Robinson, Oklahoma City, amici curiae.

GIBSON, J. Cause No. 33336 is an appeal from an order of the Corporation Commission providing for the unitized management, operation and further development of what is designated as "West Cement Medrano Unit", located in Caddo county, Oklahoma, made in pursuance of the provisions of 52 O. S. Supp. 1945 §§286.1 to 286.17. Cause No. 33708 is an original action for a writ prohibiting the Corporation Commission from exercising further jurisdiction in the matter of said unitization. Since the question of the issuance of the writ depends upon the issues involved on the appeal the same will be disposed of following determination of the appeal.

Involved on the appeal are two major questions. One, the constitutionality of said sections of the statute which, as a whole, constitute what is known as the Unitization Act (H. B. 339 of the 1945 Oklahoma Legislature). The other, the legality of the order of the Commission if authorized under the Act to effect unitization. These questions will be considered in the order stated.

The nature of the Act and the purposes sought to be accomplished thereby are clearly reflected in the legislative declaration made in the first section thereof, as follows:

"Sec. 286.1. The Legislature finds and determines that it is desirable and necessary, under the circumstances and for the purposes hereinafter set out, to authorize and provide for unitized management, operation and further development of the oil and gas properties to which this Act is applicable, to the end that a greater ultimate recovery of oil and gas may be had therefrom, waste prevented, and the correlative rights of the owners in a fuller and more beneficial enjoyment of the oil and gas rights, protected."

Plaintiffs in error recognize that the subject-matter of the Act is one within the police power of the state and that the constitutional questions presented are whether the Act constitutes a reasonable exercise thereof.

We will refer to and state or quote the particular provisions of the Act involved on considering the arguments directed thereto.

The plaintiffs in error, though numerous, represent but three classes in interest: lessors, lessees and those having, severally, royalties interest which are in excess of one-eighth of the total production.

On behalf of the lessees it is contended that the Act is violative of art. II, sections 7, 15, 23 and 24 of the Constitution of the State of Oklahoma, and of art. I, sec. 10, of the Fourteenth Amendment to the Constitution of the United States. For the purpose of the presentation, there is no segregation of the contentions as to each of said constitutional provisions for the expressed reason the grounds relied on have common application to all. Two grounds are relied on. One, the Act as a whole is unreasonable. The other, the Act constitutes an unauthorized delegation of legislative power.

On behalf of the lessors it is contended that the Act is violative of all of said constitutional provisions and of section 51 of art. V of the Constitution of the State of Oklahoma. The several violations are referable to definite grounds which have common application and there is no occasion to segregate the contentions as to each. Five grounds are relied on. One, the Act constitutes an unauthorized delegation of legislative power, which ground is the same as lessees' ground number Two and is urged on the same bases. Two, that both in the formation of the unit and in the committee management

thereof lessees only are recognized and therefore to the exclusion of the lessor. Three, the Act imposes an unauthorized burden upon the royalty interest in the production. Four, the Act imposes an unauthorized burden upon the leased premises of the lessor. And, fifth, the Act is violative of the obligations of contracts.

The substance of lessees' ground One is that the Act is unreasonable because it does not require as a condition to the establishment of the unit a finding by the Commission that, for the purpose of conservation, the application of Act will be more effective than that of the existing laws. In support thereof attention is called to the fact that under the provisions of the Act the unit may be established in fields where production has been had for nearly twenty years; that unitization, in which gas energy is a prime factor for operation, would be less satisfactory by reason of the expenditure thereof during operations prior to unification and would disturb the multitude of rights that had become established on the basis of the methods being employed under the existing laws. There is then declared:

"It is our earnest contention that a compulsory unitization statute which clearly disrupts the existing law and existing rights can only be justified where the advantages to be gained far offset the losses to be sustained to property or individual rights."

There are then recited the findings required of the Commission by the Act, and it is stated that thereunder "the Commission could approve a plan of unitization which definitely could not result in an increased recovery of oil and gas over that being accomplished by present methods of operation under the general conservation law." It is then declared that, by reason thereof:

"We submit that any compulsory unitization law, competing with the general conservation law whose real purpose is exactly the same, should not be given constitutional sanction under

the police power unless it specifically provides that the Commission finds that any plan of unitization approved thereunder will accomplish the conservation of oil and gas with substantially greater results than is being accomplished under the general conservation law still in full force and effect."

The findings required by the Act appear in section 286.4, as follows:

"If upon the filing of a petition therefor and after notice and hearing, all in the form and manner and in accordance with the procedure and requirements hereinafter provided, the Commission shall find (a) that the unitized management, operation and further development of a common source of supply of oil and gas or portion thereof is reasonably necessary in order to effectively carry on pressure-maintenance or repressuring operations, cycling operations, water flooding operations, or any combination thereof, or any other form of joint effort calculated to substantially increase the ultimate recovery of oil and gas from the common source of supply; and (b) that one or more of said unitized methods of operation as applied to such common source of supply or portion thereof are feasible, will prevent, waste and will with reasonable probability result in the increased recovery of substantially more oil and gas from the common source of supply than would otherwise be recovered; and (c) that the estimated additional cost. if any, of conducting such operations will not exceed the value of the additional oil and gas so recovered; and (d) that such unitization and adoption of one or more of such unitized methods of operations is for the common good and will result in the general advantage of the owners of the oil and gas rights within the common source of supply or portion thereof directly affected, it shall make a finding to that effect. . . ."

As indicated in the contention, the Act does not authorize the Commission to withhold establishment of unification where in the opinion of the Commission oil conservation may be accomplished better under existing laws. It limits the findings required of the Commission to the ascertainment of definite

facts which in the opinion of the Legislature are sufficient to justify application of the law.

There is no contention that the standards prescribed are insufficient in any respect other than in not including the suggested finding. Therefore, it necessarily follows that the contention challenges the authority of the Legislature in dealing with matters of policy, which is a realm that is without the scope of judicial inquiry. The Supreme Court of the United States, in C. B. & Q. Railroad Co. et al. v. McGuire, 219 U. S. 549, 31 S. Ct. 259, 55 L. Ed. 328, 339, said:

" . . . The scope of judicial inquiry in deciding the question of *power* is not to be confused with the scope of legislative considerations in dealing with the matter of *policy*. Whether the enactment is wise or unwise, whether it is based on sound economic theory, whether it is the best means to achieve the desired result, whether, in short, the legislative discretion within its prescribed limits should be exercised in a particular manner, are matters for the judgment of the Legislature, and the earnest conflict of serious opinion does not suffice to bring them within the range of judicial cognizance."

This court, in Re Application of Richardson, 199 Okla. 406, 184 P. 2d 642, said:

"The Legislature is itself the judge of the conditions which warrant legislative enactments, and they are only to be set aside when they involve such palpable abuse of power and lack of reasonableness to accomplish a lawful end that they may be said to be merely arbitrary, capricious, and unreasonable, and hence irreconcilable with the conception of due process of law."

To the same effect see Herrin v. Arnold, Judge, 183 Okla. 392, 82 P. 2d 977; Jack Lincoln Shops, Inc., v. State Dry Cleaners' Board, 192 Okla. 251, 135 P. 2d 332; Phelps et al. v. Childers, State Auditor, 184 Okla. 421, 89 P. 2d 782; City of McAlester v. Jones, 181 Okla. 77, 72 P. 2d 371; Barnes v. Smith, Judge, 179 Okla. 71, 64 P. 2d 1217;

Grable v. Childers, State Auditor, 176 Okla. 360, 56 P. 2d 357.

Though not necessary to so state, the Act reflects that the Legislature not only considered operations had and being had under existing laws, but gave recognition to those methods employed which it considered to better serve the overall purpose of conservation by withholding the application of the Act thereto. Such is reflected in second section of the Act (52 O. S. Supp. 1945 §286.2), which we quote:

"This Act shall apply only to common sources of supply of oil, oil and gas, or gas distillate in this State.

"The provisions of this Act shall not apply to any common source of supply of oil, oil and gas, or gas distillate or any part or parts thereof which at the effective date of this Act are being operated by or under pressure maintenance, repressuring, or secondary recovery methods or operations, provided, that nothing contained in this Act shall prevent the voluntary inclusion and extension of areas in which are located such existing pressure maintenance, repressuring, or secondary recovery methods or operations as unit areas under the provisions of this Act. Provided this Act shall not apply to any field where the discovery well has been drilled twenty (20) years prior to the effective date of this Act."

Lessees' ground number Two and lessors' ground number One, both to the effect the Act constitutes an unauthorized delegation of legislative power, have reference to the force of the following provisions of the Act:

" . . . To give the Commission jurisdiction hereunder, the petition shall be filed by, or with the authority of, lessees of record of fifteen per cent (15%) or more of the area of the common source of supply or portion thereof sought to be unitized. The petition shall set forth a description of the proposed unit area with a map or plat thereof attached, must allege the existence of the facts required to be found by the Commission as hereinabove provided and shall have attached thereto a recommended plan of unitization applicable to such

proposed unit area and which the petitioners consider to be fair, reasonable and equitable. (Sec. 286.4).

" . . .

"If at any time after the filing of a petition for the creation of a unit and within sixty (60) days after the entry of an order by the Commission approving the creation of the same, lessees of record of fifty per cent (50%) or more of the proposed unit area, if prior to the entry of the order by the Commission, or lessees of record of fifteen per cent (15%) or more of the unit area as defined by the approved plan of unitization and order of the Commission, if after the entry of such order, shall file written protest with the Commission against the creation of the unit, the Commission shall vacate all action of any kind theretofore taken and dismiss the proceedings for the creation of such unit." (Sec. 286.6.)

It is contended that, since the fact of the legislation is made dependent upon the will of a majority of those to be affected thereby, there is a delegation of legislative power. As supporting the contention that there has been an unauthorized delegation of legislative power and a violation of due process by reason thereof, the cases of Carter v. Carter Coal Co., 298 U. S. 238, 56 S. Ct. 855, 80 L. Ed. 1160, and State of Washington ex rel. v. Roberge, 278 U. S. 116, 49 S. Ct. 50, 73 L. Ed. 210, are relied on. In the Carter case the donees of the power were given authority to make decisions determinable of the rights of others and in the Washington case the donees were given an arbitrary power to veto the exercise by others of their unquestioned rights. Neither situation obtains herein.

In the first place, the powers so granted can neither establish nor disestablish the unitization when established because the power of establishment rests with the Corporation Commission. In such situation there is not a trace of legislative power exercised. This conclusion is fortified by the fact that even if the establishment were dependent upon the will of the lessees

their exercise thereof would not be the exercise of legislative authority. The reason for this is clearly reflected in the opinion of the Supreme Court of the United States in Currin v. Wallace, 306 U. S. 1, 83 L. Ed. 441. Therein it is said:

"So far as growers of tobacco are concerned, the required referendum does not involve any delegation of legislative authority. Congress has merely placed a restriction upon its own regulation by withholding its operation as to a given market 'unless two-thirds of the growers voting favor it.' Similar conditions are frequently found in police regulations. Thomas Cusack Co. v. Chicago, 242 U. S. 526, 530, 61 L. Ed. 472, 475, 37 S. Ct. 190, L.R.A. 1918A, 136 Ann. Cas. 1917C, 594. This is not a case where a group of producers may make the law and force it upon a minority (see Carter v. Carter Coal Co., 298 U. S. 238, 310, 318, 80 L. Ed. 1160, 1188, 1192, 56 S. Ct. 855) or where a prohibition of an inoffensive and legitimate use of property is imposed not by the Legislature but by other property owners (see Washington ex rel. Seattle Title Trust Co. v. Roberge, 278 U. S. 116, 122, 73 L. Ed. 210, 214, 49 S. Ct. 50, 86 A.L.R. 654). Here it is Congress that exercises its legislative authority in making the regulation and in prescribing the conditions of its application. The required favorable vote upon the referendum is one of these conditions. The distinction was pointed out in J. W. Hampton, Jr., & Co. v. United States, 276 U. S. 394, 407, 72 L. Ed. 624, 629, 48 S. Ct. 348, where, in sustaining the so-called 'flexible tariff provision' of the Act of September 21, 1922, and the authority it conferred upon the President, we said: 'Congress may feel itself unable conveniently to determine exactly when its exercise of the legislative power should become effective, because dependent on future conditions, and it may leave the determination of such time to the decision of an Executive, or, as often happens in matters of state legislation, it may be left to a popular vote of the residents of a district to be affected by the legislation. While in a sense one may say that such residents are exercising legislative power, it is not an exact statement, because the power has

already been exercised legislatively by the body vested with that power under the Constitution, the condition of its legislation going into effect being made dependent by the Legislature on the expression of the voters of a certain district.' "

This type of legislation is not uncommon and has been applied in a variety of situations where community of interest obtains. Frequent examples are acts dealing with water rights and drainage. In Oklahoma it is reflected in 82 O. S. 1941 §§111-273, providing for creation of Irrigation Districts upon petition of fifty or a majority of the holders of title to lands susceptible of irrigation; in 82 O. S. 1941 §§281-382, providing for creation of Drainage Districts upon petition of five or more residents, and further providing (§311) that upon protest of 50% of the landowners, or owners of 50% of the total acreage embraced in the district, the proceedings are to be dismissed; in 82 O. S. 1941 §§541-687, providing for creation of Oklahoma Conservancy District Act, upon petition of percentage of property owners and the dismissal of the proceedings upon protest of a percentage of the landowners; and 82 O. S. 1941 §721 et seq., providing for creation of Water Improvement District upon petition of fifty or a majority of the holders of title to lands in the proposed district. Under authority of these Acts districts have been created and thereafter have functioned. It does not appear that the constitutionality of any has been challenged upon the ground that the operation of the law is predicated upon the will of those whose interests are involved although the question of rights controlled by the Acts has been involved in litigation and the validity of the Acts recognized by this court. (Fry v. Swift, 164 Okla. 4, 22 P. 2d 94; Seikel v. Grimes, County Treas., 189 Okla. 658, 119 P. 2d 59.) That question, however, has been presented frequently in other jurisdictions and, so far as we have noted, the uniform holding is to the effect there is no delegation of legislative power and in the briefs herein there have been cited no cases in point holding to the contrary. State v. Drainage District No. 1, 123 Kan. 191, 254 P. 372; Barrett v. City of Osawatomie, 131 Kan. 50, 289 P. 970; Tarpey v. McClure, 190 Cal. 593, 213 P. 983; City of Dawson v. Bolton, 166 Ga. 232, 143 S. E. 119; Boagni v. Mayor and Board of Aldermen of City of Opelousas, 177 La. 835, 149 So. 494; Field v. Barber Asphalt Paving Co., 194 U. S. 618, 24 S. Ct. 784, 48 L. Ed. 1142.

We are of the opinion that lessors' ground number Two is without merit. The basis of the conclusion is that there is not granted to the royalty owners like power of petition and protest as that granted to the lessees. Under the Act the landowners who have not leased their acreage are classed as lessees.

The question is not the wisdom of granting the right of protest to the lessees while withholding it from the royalty owners but whether it was within the power of the Legislature so to do. It was within the power of the Legislature to do so because being within its police power to enact the law without the consent of either lessees or royalty owners it was optional with it to requirie the consent of either. Where privilege is granted to some in such situation the Constitution is satisfied if all similarly situated are treated alike. This statement of the law has been declared in many decisions. A clear-cut statement thereof is made in Taggart v. Claypool, 145 Ind. 590, 32 L.R.A. 586, 44 N. E 18. The United State Supreme Court, in Field v. Barber Asphalt Paving Co., supra, said:

"The exact point of objection is that the improvement is not to be made if a majority of the resident owners of the property liable to taxation therefor shall file with the city clerk a protest against such improvement, which privilege of protest is not given to nonresident owners, thereby discriminating

against them. It is well settled, however, that not every discrimination of this character violates constitutional rights. It is not the purpose of the 14th Amendment, as has been frequently held, to prevent the states from classifying the subjects of legislation, and making different regulations as to the property of different individuals differently situated. The provision of the Federal Constitution is satisfied if all persons similarly situated are treated alike in privileges conferred or liabilities imposed. (Citations omitted.) The alleged discrimination is certainly not an arbitrary one; the presence within the city of the resident property owners, their direct interest in the subject-matter, and their ability to protest promptly if the means employed are objectionable, place them on a distinct footing from the nonresidents, whom it may be difficult to reach. Furthermore, there is no discrimination among property owners in taxing for the improvement. When the assessment is made it operates upon all alike. It has been held to be within the power of the Legislature of Missouri to authorize the council to order the improvement to be made without consulting property owners. Buchan v. Broadwell, 88 Mo. 31. If the Legislature saw fit to give to those most directly interested, and whose consent could be most readily obtained, the right to protest, such action did not deprive the other persons of rights guaranteed by the Constitution."

Involved under the Act are the plural rights of production from the common pool. The purpose of the Act is to so adapt the exercise of such rights that the value of the reservoir may be realized to the fullest degree possible by those entitled thereto and according to their respective shares therein. This can be done only through an intelligent control of the drilling operations. The royalty owners are those who have committed to lessees their right to produce in exchange for a definite share in the production. Such rights have been so committed in reliance upon the ability of the lessees to produce. Neither the fact of nor the amount of the royalty interest presents any problem for solution in establishing un-ification because same is recognized and fixed by the law. The real problem involves an appraisal and adaptation of the existing problems that rest upon the shoulders of the lessees. By reason of their responsibility the lessees have an interest that is distinctive from that of the royalty owners but it is not adverse thereto because the interests of the latter are dependent upon and must rise or fall with that of the lessees. By reason of their knowledge of the problems they, necessarily, are in a better position than the royalty owners to appraise the practicability and hence the wisdom of unification. To realize that the information they possess is deemed vital to a determination of the question of unification, one needs only to read the showing that is required by the Act to be made. By reason of their activity the lessees are in a position to both attest the wisdom or lack of wisdom of unification and produce the evidence that is determinative thereof. The royalty owners, who by their own acts have completely divorced themselves from the activity, are often not conveniently accessible and could afford little if any helpful information if available, but they are granted the right of an appeal from the action of the Commission, and this case is an example of its exercise. The distinction between the lessees and the royalty owners as classes in interest and the reason why the Legislature should extend a privilege so responsible to one and not the other is so manifest that it precludes any idea that in doing so the legislative Act was capricious. Such being true there is no basis for holding the Act unconstitutional for that reason.

Lessors' ground Three, that the Act imposes an undue burden upon the royalty, has reference to the provisions of the Act which treats the royalty interest that is in excess of one-eighth of the production as a part of the lessees' working interest which is considered to be seven-eighths of the production. It is contended that, under the

lease contract, the lessor is entitled to the full amount of the royalty run to his credit free from liability for operating expense. That his right in that respect is impaired because such royalty in excess of one-eighth of production is made liable for operating expense.

Under the Act a one-eighth part of the unit production allocated to each separately owned tract is to be regarded as royalty and to be distributed to or among the royalty owners free and clear of unit expense, and the remaining seven-eighths is designated as a leasehold interest and made liable for the unit expressly chargeable to such tract. The effect of the unitization upon any royalty interest in excess of one-eighth under any existing lease and the provision made therefor is reflected in the following (52 O. S. Supp. 1945, §§286.9):

"Subject to such reasonable limitations as may be set out in the plan of unitization, the unit shall have a first and prior lien upon the leasehold interest only in the unitized common source of supply (exclusive of a one-eighth (1/8) royalty interest) in and to each separately-owned tract, the interest of the owners thereof in and to the unit production and all equipment in the possession of the unit, to secure the payment of the amount of the unit expense charged to and assessed against such separately-owned tract. The interest of the lessee or other persons who by lease, contract or otherwise are obligated or responsible for the cost and expense of developing and operating a separately-owned tract for oil and gas in the absence of unitization shall, however, be primarily responsible for and charged with any assessment for unit expense made against such tract and resort may be had to overriding royalties, oil and gas payments, royalty interests in excess of a one-eighth (1/8) of the production, or other interests which otherwise are not chargeable with such cost, only in the event the owner of the interest primarily responsible fails to pay such assessment or the production to the credit therefor is insufficient for that purpose. In the event the owner of any royalty interest, overriding royalty, oil and gas payment or other interest which under the plan of unitization is not primarily responsible therefor pays in whole or in part the amount of an assessment for unit expense for the purpose of protecting such interest, or the amount of the assessment in whole or in part is deducted from the unit production to the credit of such interest, the owner thereof shall to the extent of such payment or deduction be subrogated to all of the rights of the unit with respect to the interest or interests primarily responsible for such assessment."

The importance of the segregation of a definite amount of the total production as royalty is manifest and it is further attested by the fact it is made an integral part of all leases where the cost of operation is to be borne by the lessee. It follows that such segregation is as fully important where the operation is unitized and operated as one lease. In such situation the question is whether the proportion of the production to be regarded as royalty is reasonable. The amount thereof is not called in question so far as the same affords the basis of the unit operation, but it is held that the effect thereof is to impose an unlawful burden on any royalty interest in excess of the one-eighth, if such there be. Considering, as we must, that the one-eighth royalty prescribed is reasonable to accomplish the overall purpose, it follows that the right to the exceptional royalty as such much yield to the extent it militates against the plan but should be preserved to the extent it may be done consistently with such plan. We hold that the Act gives full recognition to such right and only varies the method prescribed in the lease for its enjoyment. Prior to unitization such a lessor would be entitled to receive the entire royalty share free from the cost of production. The enjoyment of this right, however, was based upon the obligation of the lessee to produce and so deliver. Under the unitization such obligation obtains upon the unit to the extent of a one-eighth royalty and the

obligation of the lessee to account for the remainder is recognized and declared. The liability of any excess royalty is made possible because for the plan of operation it is accorded the status of a leasehold interest. But by reason of the lease contract treating it as royalty the liability is made secondary and could only obtain where there was a breach of the obligation of the lessee to discharge the operation cost allowable thereto as part of the leasehold interest. We take it that the extent of the right and the assurance of its enjoyment is in substance preserved.

In support of lessors' ground number Four it is urged that the Act authorizes the unit to burden the leased premises beyond the right of the lessee thereof to do so.

If it be true that the Act authorizes the unit to burden any premises beyond the right of the lessee thereof and at the same time in excess of what would be justified for the operation of the unit, such fact, appertaining to be a matter of detail in the operation of the unit, could not be held to affect the integrity of the Act as a whole because, by the terms of the Act, the provisions are made severable (52 O.S. Supp. 1945, §286.16). Though the Act may authorize such an additional burden it does not require that such burden be placed thereon in derogation of the lessors' rights. And we cannot anticipate that those charged with the operations of the unit will exercise the powers granted in an unlawful manner.

The 50 per cent provision of section 286.4 has hereinbefore been considered. No rights have been exercised under the 15 per cent provision of section 286.6, though its validity is questioned here. It is unnecessary to determine the constitutionality of this provision at this time. The same is true of the 10 per cent provision of section 286.11 providing for reconsideration by the Commission of the plan in operation

and fixed correlative rights thereunder. These undetermined questions are reserved.

Bearing upon the contentions that the order of the Commission is contrary to the evidence there is said:

"The petition and amended plan of unitization and order of Commission approving the same in form follows generally the requirements of the statutes under which they were prepared and made. The broad issue raised by The Palmer Oil Corporation and other petitioners in error is that the order of the Commission approving the plan of unitization was contrary to the clear weight of the evidence in one or more respects. The petitioners in error also raise the question of constitutionality."

The Act provides that one aggrieved by the order may appeal to this court and defines the jurisdiction and duty of this court on appeal, as follows:

". . . The Supreme Court on appeal shall have jurisdiction and authority and it shall be its duty to review the record of proceedings and transcript of evidence and to consider the validity of the order of the Commission appealed therefrom. On appeal the order of the Commission appealed from shall be regarded as prima facie valid, fair, reasonable and equitable, but if the order is found to be contrary to the clear weight of the evidence, in any one of such respects, the same shall be vacated and set aside and the cause referred to the Commission for further proceedings not inconsistent with the judgment of the court; otherwise, the said order shall be affirmed." (Sec. 286.7.)

By reason of the presumption which is expressly made to attend the order of the Commission, there is cast upon plaintiffs in error the burden of showing that the order in the respects challenged is contrary to the weight of the evidence and we have repeatedly so held. Croxton v. State, 186 Okla. 249, 97 P. 2d 11; Grison Oil Corp. v. Corporation Commission, 186 Okla. 548, 99 P. 2d 134; Oklahoma Cotton Ginners'

Ass'n v. State, 174 Okla. 243, 51 P. 2d 327; Denver Producing & Refining Co. v. State, 199 Okla. 171, 184 P. 2d 961.

The importance of the rule lies in the fact that the formulation and execution of the legislative policy has been entrusted to the Commission because it is thought to be peculiarly experienced and fitted for the purpose and it is not to be contemplated that the courts may substitute their notions of expediency and fairness for that of the Commission. Peppers Refining Co. v. Corporation Commission, 198 Okla. 451, 179 P. 2d 899; Denver Producing & Refining Co. v. State, supra.

In the light of these governing rules, we consider the several alleged grounds of error in making the order.

It is contended that the area of the West Cement Medrano Unit is not limited to one "common source of supply."

Under the Act, a unit must be limited to a common source of supply. The Act does not in express terms define a common source of supply, but there was at the time of the enactment a legislative definition of the term (52 O. S. 1941 §84(c), now 52 O. S. Supp. 1947 §86.1(c) ), and we construe such definition as a part of the Act. Therein, the term is thus defined:

"(c) The term 'Common Source of Supply' shall comprise and include that area which is underlaid or which, from geological or other scientific data, or from drilling operations, or other evidence, appears to be underlaid, by a common accumulation of oil or gas or both; provided, that, if any such area is underlaid, or appears from geological or other scientific data, or from drilling operations, or other evidence, to be underlaid by more than one common accumulation of oil or gas or both, separated from each other by a strata of earth and not connected with each other, then such area, as to each said common accumulation of oil or gas or both, shall be deemed a separate common source of supply;".

That more than one common source of supply may exist in a given sand

appears to be recognized in the statute, and in H. F. Wilcox Oil & Gas Co. v. State, 162 Okla. 89, 19 P. 2d 347, we held that more than one common source of supply could obtain in such sand by reason of faults that constitute impervious barriers between segments thereof.

The existence of faults in the unit area is recognized and the question before Commission was whether the segments of the sand were disconnected by reason of the faults. The finding of the Commission (in paragraph 2) which is directly responsible to the issue is as follows:

" . . . that the said Medrano sandstone underlying said above described lands as aforesaid constitutes a single common source of supply of oil and gas, all parts of which are permeably connected so as to permit the migration of oil or gas or both from one portion of said common source of supply to another wherever and whenever pressure differentials are created as a result of the production or operations for the production of oil or gas from said producing formation; that although faults are known to exist in parts of said common source of supply said faults do not prevent substantial migration of oil and gas and of pressures from one part of said common source of supply to another; that said common source of oil and gas has heretofore been designated by the Commission and is generally known as the West Cement Medrano Pool."

The question of the faults in the area and the effect thereof had previously been before the Commission a number of times, and the study and hearings thereon had culminated in orders wherein the Commission found that the whole of the Medrano sand as then developed was in fact one common source of supply. At the hearing herein the testimony adduced was chiefly that of petroleum engineers and geologists who testified on the basis of both personal surveys made and of an interpretation of the accumulated data in the hands of the Commission. The testimony of these experts was in direct

conflict but that of each was positive upon the issue. Under the circumstances the objection is necessarily addressed to only the weight of the evidence. Under the holding of this court and that of courts generally (Chicago, R. I. & P. Ry. Co. v. Pruitt, 67 Okla. 219, 170 P. 1143; 22 C. J. 728, §823) the weight to be given opinion evidence is, within the bounds of reason, entirely for the determination of the jury or of the court, when trying an issue of fact, it taking into consideration the intelligence and experience of the witness and the degree of attention he gave to the matter. The rule should have peculiar force herein where by the terms of the Act the Commission is recognized as having peculiar power in weighing the evidence. Since the evidence before the Commission was competent and sufficient, if believed, to .sustain the order, we must, and do, hold that the order is sustained by the evidence and that the contention is without merit. Ft. Smith & W. Ry. Co. v. State, 25 Okla. 866, 108 P. 407; Bromide Crushed Rock Co. v. Dolese Bros. Co., 121 Okla. 40, 247 P. 74.

It is contended that the proposed area of the Medrano sand included within the unit has not been reasonably defined by actual drilling operations.

52 O. S. Supp. 1947 §286.5 provides, in part, as follows:

"The order of the Commission shall define the area of the common source of supply or portion thereof to be included within the unit area and prescribe with reasonable detail the plan of unitization applicable thereto.

"Each unit and unit area shall be limited to all or a portion of a single common source of supply. Only so much of a common source of supply as has reasonably been defined by actual drilling operations may be so included within the unit area."

Paragraph 4 of the Commission's Findings of Fact, to which attention is called, is as follows:

"That the outer boundaries of said common source of supply of oil and gas underlying and by this Order included within the aforesaid Unit Area have been reasonably defined by actual drilling operations, both by the drilling of wells within and the drilling of wells outside said Unit Area; that said Unit Area consists of approximately 3700 acres of land."

It is urged (1) that the Commission does not find that "all portions of the alleged common source of supply included within the unit area has been reasonably defined by actual drilling operations", and (2) that there is included within the unit areas wherein the common source of supply has not been defined by actual drilling operations.

There is no merit in the first ground. Paragraph 2 of the Commission's findings, hereinbefore quoted and discussed, expressly finds that the sand constitutes a common source of supply throughout the area of the unit. The presumption is that same was made on the basis of the required statutory showing. And the Commission in effect so declares in Finding No. 12, where it is said that the plan of unitization "in all respects conforms to and complies with the requirements of H. B. 339 of the 1945 Oklahoma Legislature."

The limits of the pool and of the unit area were determined by the productive boundaries reflected in exhibits prepared by the Geological Committee and based on data and information gained from wells actually drilled to the Medrano sand or to depths sufficient to encounter the sand if present.

Within the unit there are numerous tracts on which no wells have been drilled into the Medrano sand. The source of the common supply thereunder, which is reflected in said exhibits, was predicated on the evidentiary force of drilling operations had in other areas.

It is not contended that the exhibits do not reflect the common source of supply under the undrilled tracts nor that the wells drilled elsewhere were

not sufficient to show that existence of the supply thereunder—in fact, the expert witnesses of both plaintiffs in error and defendants in error testified that the drilling operations had were sufficient therefor. The contention is that actual drilling upon the tracts is required by the Act in order to justify a finding of the common source of supply. The contention is thus stated:

"Our interpretation of the statute requires the Commission to find that the common source of supply has been reasonably defined by actual drilling operations in respect not only to the outer boundaries but also all tracts therein included, as well as the depth of the common source of supply."

The theory advanced is that the words of the statute, "reasonably defined by actual drilling operations", negative the idea that the finding can be predicated upon drilling operations had elsewhere and that independently of the statutory provision opinion evidence of the existence of the common source of supply under such tracts based on the wells drilled elsewhere is mere conjecture. As supporting the latter contention, Myers et al. v. Shell Petroleum Corporation, 153 Kan. 287, 110 P. 2d 810, is cited as holding that the opinion evidence of an expert geologist on geological conditions at a point one-half mile distant from the control point was mere conjecture and could not be accepted as law. The court there did not expressly nor in substance hold that such distance from the control point, as a matter of law, made the opinion conjecture, but that by reason thereof and other facts which would preclude the evidentiary force thereof the same was not permitted to go to the jury. However, even if the construction of the holding were justified it would not be persuasive as authority herein where the particularity which is required in a court of law does not obtain. Peppers Refining Co. v. Corporation Commission, supra.

Actual drilling upon the undrilled tracts or within a definite proximity thereto is neither prescribed by the statute nor by law. In fact, we are of the opinion that each is negatived, the first by the language of the statute and the other by the holding in the Peppers case, supra.

The alleged mandatory force of the statute is predicated upon the use of the word "reasonably" as used in the statute. We think the use of the word precludes rather than justifies the construction claimed. If the word "reasonably" were omitted the words "defined by actual drilling operations" would import absoluteness. The effect of prefixing the word "reasonably" to the words "been defined" necessarily qualifies the import of absoluteness which would obtain without it. In prescribing the formula the Legislature must have had in mind the impracticability of accomplishing the full purpose of the Act if its operation was to be conditioned upon actual drilling on all tracts. There is no prescription touching the places of the drilling operation nor the depth of the wells nor of what must be reflected therein. The only prescription is that the source of supply must have reasonably been defined hereby. The drilling operations required are simply those the evidentiary force of which is sufficient to justify a conclusion, by those capable in law of weighing the facts as to the existence of the source of supply. There is unanimity in the testimony herein that the wells drilled afforded sufficient evidence to define the common source of supply within the unit area and the Commission so found. We hold that said attack upon the order is without merit.

It is contended that the discovery well in the West Cement Field was drilled and completed more than twenty years prior to the effective date of the Unitization Act and, therefore, the Act does not apply to such field and, by

reason thereof, there is no authority in law for the order of the Commission.

There is involved a construction of sec. 286.2 of the Act, quoted above.

The West Cement Medrano sand, which is the common source of supply of the unit, was discovered October 15, 1936. The first discovery of oil and gas in the area of the unit was on or about October 17, 1917, but same was in a sand different from the Medrano sand. The question is, which of the wells is the discovery well within contemplation of the statute. If it be the well drilled in 1917 the Commission was without authority to establish the unit. If it be the well drilled in 1936 the authority to establish the unit is beyond question. Such was the issue before the Commission, and thereon it held:

"That the West Cement Medrano pool is a field within the meaning of that term as used in the second paragraph of Section 2 of H. B. 339 of the 1945 Oklahoma Legislature; that the term 'field' in ordinary usage has no fixed or definite meaning but is sometimes used to refer to the general area where a number of oil or gas producing formations are found and at other times used to refer to a particular common source of supply or pool; that as used by the Legislature aforesaid, the term was intended to relate to the particular common source of supply or pool sought to be unitized under the Act and not to any general area which in a broader sense could be termed a field; that in effect said Act throughout relates to and deals only with single common sources of supply of oil and gas."

It is said that the word "field" has a commonly accepted meaning which denotes the surface area where there is a production and carries no significance as to the sand from which the production is had and that, is absence of a different meaning, apparent or obvious from the statute or definitely indicated thereby, the word should be construed in accordance with said commonly accepted meaning. It is further said that since the term "common source of supply" is used frequently in the Act while the word "field" is used but once, as indicated, it must be presumed that the word reflected a different meaning than that of the term "common source of supply".

Defendants in error recognize the fact that the ordinary meaning of the word "field" is as contended and that the word appears only once in the Act. They do not question the correctness of said rules of construction where the force thereof is not limited. They contend that the rules are subservient and therefore subordinate to the fundamental rule of construction that the legislative intent is to be gathered from the entire Act. And, as declaring said rule and, at the same time giving an apt illustration of the limitations upon the rules relied on by plaintiffs in error, there is quoted from Meads et al. v. Human, 84 Okla. 82, 202 P. 797, the first paragraph of the syllabus, which is as follows:

"In considering a legislative enactment it is not safe to base a construction upon a particular word or phrase, for the language of legislative enactments is not always precise and accurate, and, besides, one portion may frequently be designed to extend, qualify, or limit another so that the meaning of one portion of a statute may depend upon the effect of another. Hence, it is an established rule in the exposition of statutes that the intention of the lawgiver is to be deduced from a view of the whole and of every part of a statute taken and compared together. The several provisions of the statute should be construed together in the light of the general purpose and object of the act and so as to give effect to the main intent and purpose of the Legislature as therein expressed. If possible a statute should be so construed as to render it a consistent and harmonious whole; if different portions seem to conflict, they should, if practicable, be harmonized, that construction being favored which will render every word operative rather than one which makes some words idle and nugatory."

In the light of this rule the question is what construction is consonant with

the general purpose and object of the Act. That the functions of the Act have reference to a definite sand as the source of common supply and is without reference to other sand or sands that may afford another source of supply within the same field, is without question. As indicated in section 286.2, quoted above, the fact of previous development had in the area constituting the unitized pool, the extent thereof and the methods employed are taken into consideration and the functioning of the unitization plan is required to yield thereto in designated instances. It thus appears that the extent of development in the source of supply that is made subject to unification was within the legislative mind. If the well drilled in the field in 1917 had discovered the West Cement Medrano sand the Act would not authorize the unitization. The Act, in terms, makes no reference to any development in any sand other than that to which the unitization is made to apply and it cannot be gathered from the Act that the fact of discovery of other production in the field is material to the operation of the unit. We are of the opinion that the only logical deduction to be made, when considering the Act as a whole, is that the discovery well, in the mind of the Legislature, is that well in the field that discovered the common source of supply which is the subject of the unification. To hold otherwise would not only defeat the legislative intent herein but in other situations as well, because the court takes judicial knowledge of the fact major pools have been and may yet be discovered in areas where many years ago oil had been discovered in upper and shallower sands which have become practically if not completely depleted.

The order of the Commission is attacked upon the further grounds (1) the proposed "plan of unitization" is not "fair, reasonable and equitable" as required by section 286.5 of the Act, and (2) the "division of interest or formula for the . . . allocation of the unit production" is not fair, equitable and reasonable as required by said section.

These contentions require no extended discussions. They are directed solely to the weight of the evidence and the most that is shown in the argument is the existence of conflict in parts only of the evidence. Such does not challenge the weight of the pertinent evidence as a whole and for reasons hereinbefore stated does not disturb the presumption that attends the order of the Commission.

Plaintiff in error the Palmer Oil Corporation, a lessee, contends that the order of the Commission is particularly unfair, inequitable and unreasonable as to it as an operator.

Comprised within the unit is the S.W. ¼ of sec. 35, twp. 6 N., R. 10 W., upon which the Gulf Oil Corporation held an oil and gas lease from the owners. In 1938 Gulf assigned to Palmer all of its right, title and interest therein to the depth of 6,000 feet, "retaining the lease as to the oil, gas and casinghead gas, together with all the rights, privileges and appurtenances thereunto belonging, below the depth of 6,000 feet." The 6,000 foot subsurface level passes through the Medrano sand by reason of which there is productivity in the sand both above and below said level. Palmer drilled a well to but not beyond said level and obtained production from said sand therein. Gulf has no well producing from the sand below said level and is not authorized under the Unitization Plan to drill and produce therefrom. The Palmer well was completed during the pendency of these proceedings before the Commission. The order of the Commission fixed the percentage of the authorized lease production that each should receive and hold same to be applicable to the production of the Palmer well. It is contended that the Commission was without authority to permit Gulf to share in such production. And further contended that the

percentage division is unfair and contrary to the evidence if Gulf is entitled to so share.

The first contention is predicated solely upon the assumption that the rule of capture obtains. That it is subject to be modified by the state in the exercise of its police power, we held in Wilcox Oil & Gas Co. v. Bond, 173 Okla. 348, 48 P. 2d 820. And that the right of capture as claimed herein does not obtain where by Act the state undertakes to protect the correlative rights of owners in a common source of supply, regulate the drilling and distribute the production thereof, we held in Patterson v. Stanolind Oil & Gas Co., 182 Okla. 155, 77 P. 2d 83.

Pertinent to the second contention are the following facts: In the plan of unitization exhibited with the petition of the proponents the percentages of the lease production allotted were Palmer 5.145% and Gulf 2.538%, reflecting a lease total of 7.683%. Speaking generally, the total, or lease percentage, was predicated on the thickness of the sand underlying the lease and such thickness was deduced from the elevations of the top and bottom of the sand as ascertained by the surveys made. And the individual percentages based upon the proportions of the thickness which lay above and below the 6,000 foot level. With the completion of the Palmer well it appeared as a matter of fact that the top of the sand at that point lay lower than reflected in the earlier survey. And, such being true, without change in the depth of the bottom of the sand as established, there was reflected at that point a less thickness of sand than was considered in fixing the lease percentage of the pool production. Touching the effect of such discovery the Commission states in its report the following:

"In addition to the proceedings and notices aforesaid, further mention is here made of the fact that during the course of said hearing, The Palmer Oil Corporation drilled and completed an additional well on a lease owned by it in the aforesaid field, necessitating a relatively slight change in the percentage of interests of the several separately owned tracts in the field shown in 'Exhibit B' attached to the recommended Plan of Unitization, and also necessitating the inclusion of such additional well in 'Exhibit D' attached to said Plan of Unitization."

As a result, the original exhibits which reflected said percentages were amended so as to reflect the lease percentage at 7.67294% (same being .01006 less than before) and the shares of Palmer and Gulf therein at 5.51614% and 2.15680%, respectively.

The question before the Commission was the extent the common thickness of the sand on the lease as previously fixed was to be diminished by reason of the diminution of thickness reflected at the point where the well was drilled. Palmer contends in substance that the thickness was 108 feet, while the Commission found same to be 96 feet. The question of the thickness turned chiefly upon the depth of the top of the sand as reflected in said well. The testimony was conflicting. The Commission determined that the weight of the evidence lay in the testimony of one Montgomery, a witness for proponents, which was concurred in by the entire Geological Committee, and not in that of one McKee, a witness for Palmer, who testified to the contrary, and so found. Under the rules hereinbefore announced we cannot say that holding of the Commission is contrary to the weight of the evidence nor that the percentages prescribes thereon are arbitrary.

The order of the Commission is affirmed.

The writ prayed in cause No. 33708 is denied.

ARNOLD, C. J., and CORN, HALLEY, and JOHNSON, JJ., concur. LUTTRELL, V. C. J., and WELCH, DAVISON, and O'NEAL, JJ., dissent.

WELCH, J. (dissenting). At the outset I would emphasize the thought that

it is too difficult to undertake to determine the constitutionality of the compulsory Unitization Act without in any manner discussing or considering the impact on this legislation of the positive provision therein which grants the unqualified veto power for sixty days to 15 per cent of the lease owners by acreage.

By that provision, considered in its necessary connection with other provisions, the act speaks for itself and thereby announces, either that it is not a necessary and proper exercise of the police power for conservation, or that it is a delegation of the police power and legislative power of the state to the will or wishes of oil operators or lessees.

In view of the positive language of this veto power provision and its direct connection as an integral part of the unitization scheme, it remains as a puzzle to me how the court can uphold the act and treat this veto power provision as some character of a separate item which may remain as a question undetermined and reserved for future determination.

It is not contended merely that this veto power provision is a separate unconstitutional part of the act. If that were all it might well be said that if compulsory unitization may be forced upon 49 plus per cent of lessees and 100 per cent lessors against their will, any possible veto power would be to that extent a welcome escape. But that is not the crux of the matter on this point at all. It is not contended merely that this veto power provision violates private rights, if it is contended at all that it violates private rights. The complete violation of private rights is accomplished by the overall, and other, provisions of the Act. As to this veto power provision, it is in fact contended that such provision is one, and an important one, of the details which demonstrate the unconstitutional attempt by this legislation to take over, for private gain, the private property rights, and

private contract rights of free citizens. With this contention I agree.

In behalf of this act it is contended that the necessity to conserve oil and gas and prevent waste is the source of the state's power to compel unitization and that such necessity authorizes and requires the state to compel unitization. But by provision of the act itself the act takes this power away from the state and lodges it in lessees, that is, first the power to initiate the proceedings, and second, the veto power for 60 days. This is a negation of the necessity of this power in the state, or an unconstitutional delegation thereof as I view it.

The compulsory unitization order here involved affected about 3,700 acres of land embracing 72 tracts under separate ownership, with numerous oil and gas lessees of separate tracts, and several hundred owners of royalty interests in the oil and gas being produced, and to be produced, from what was treated as one common source of supply. At the time of the order, distributed over most of the tracts, but not all of them, there were about 50 or more wells producing oil and gas, and some additional wells in process of drilling.

The order, over the objection of some of the lessees or operators engaged in producing oil, and over the objections of numerous landowners and royalty owners, directed the operation of the entire tract as a single unit. The result would be that a committee of the lessees would select one operator who would take over all leases and all operation of the entire acreage as to the stated source of supply, and all wells now producing oil or gas would be operated by that one operator, and all future wells would be drilled by that one operator at any or all places in the tracts, without regard to the contracted leases of the tract drilled; that all oil produced from the entire tract, or from any one or several of the 72 separate tracts would be marketed by the one operator, all expenses for op-

erating the aggregate 72 tracts deducted, and the remaining balance distributed by the operator to the various lessees and royalty owners. This distribution would be made without regard to the separate tracts from which the oil came, and without regard to any ratio of production or ratio of expense as to the various separate tracts. That is, the entire tract of 3,700 acres was to be drilled and produced, and the oil marketed, as if the aggregate tract constituted a *single unit,* covered by a single lease. The distribution of net proceeds was to be made according to a prearranged calculation intended to represent a computation of the present and future oil production value of each separate tract. That is, each separate tract was considered and it was assigned, or there was allocated to it, a stated percentage of the whole unit's future production.

This appeal tests the constitutionality of the legislative act authorizing such action and the power of the Corporation Commission to make such an order, and tests the validity and fairness of the order, and the sufficiency of the evidence before the commission.

In considering this matter and making the order the Corporation Commission acted pusurant to the provisions of 52 O. S. Supp. 1945 §§286.1 to 286.17. That act proceeded as a conservation measure on the premise that it was desirable and necessary in various circumstances to authorize and provide for unitized management and further development of an oil and gas field or pool found to be a common source of supply, "to the end that a greater ultimate recovery of oil and gas may be had therefrom, waste prevented, and the correlative rights of the owners in a fuller more beneficial enjoyment of the oil and gas rights, protected." It authorizes the Corporation Commission to supervise and administer the act and to order and compel unitized management of whatever should be the proper area of the oil field or pool under consideration. The

jurisdiction of the Corporation Commission, however, could not attach unless and until "lessees of record of 50% or more of the area . . . sought to be unitized" should file petition therefor. Then after giving notice in accordance with requirements of general oil and gas conservation statutes, and hearing all parties who desired to appear either for or against the petition, the Corporation Commission should go forward and order the unitization if it was found that . such unitization was proper, and necessary in the interest of conservation, and if the unitization plan suggested by the petitioners or approved by the Corporation Commission was thought to be or was found to be for the common good and to result in general advantage to the owners of the oil and gas rights. Provision was then made that a committee of the oil and gas lessees would select a single operator who would thereafter operate the area involved as a single unit and distribute the net oil production according to the predetermined percentage to the various separate tracts of land involved, or to the lessees and royalty owners of each separate tract. It was then provided, sec. 286.6, supra, that at any time within 60 days after the entry of the order creating the unitization unit, lessees of record of 15 per cent of the unit area might file written protest against the creation of the unit and thereupon it should become the mandatory duty of the Corporation Commission to vacate the action theretofore taken and dismiss the proceedings for the creation of such unit. And lessees whether they did or did not join in the original 50 per cent petition could join in this 15 per cent protest and destroy the unitization and accomplish dismissal of the proceedings, provided only that such action was taken within 60 days of the creative order of the Corporation Commission, and as stated in the majority opinion, any owner of land in the area not leased for oil and gas was to be classified as a "lessee" of his land for all purposes of the act. I deem it unnecessary to set out fur-

ther detail provisions of the act except such as are stated here, and such as are generally referred to in other paragraphs of this opinion.

The petition to the Corporation Commission in this instance was signed by lessees of more than 50 per cent of the area sought to be unitized, and said petitioners attached thereto a complete plan of unitization set out in great detail and at great length, with their statement of a percentage division or allocation to each separate tract of a stated interest in the future oil production from the aggregate area. And petitioners alleged they considered their stated plan and division to be fair, reasonable and equitable, all as required in section 286.4, supra.

Both lessees and royalty owners appeared and protested, but after notice and hearing the Corporation Commission made findings in favor of the petitioning lessees that unitized management of this area was proper and reasonably necessary for the purposes set out in the act, and that such unitized management would probably result in greater ultimate oil production. And the Corporation Commission approved the detailed plan of unitization presented by petitioning lessees, and ordered unitization over the objection and protest of those operators and owners of royalty interests who appeared in opposition to unitization as aforesaid.

The unitization act makes special provision for appeal to this court from such an order, sec. 286.7, supra, and such appeal is authorized under the general oil and gas conservation statutes. 52 O. S. 1941 §§111, 112, 113 and 136, as those sections are referred to in the present act in section 286.7 thereof.

While other serious questions are presented, I think the constitutional attack is controlling. Appellants in effect and in final analysis point out a number of provisions of the act, and objections thereto as it is here applied, which they urge demonstrate several violations of constitutional provision and of individual constitutional rights. We list them as follows:

1. The act, though purporting to be necessary, and justifiable under police power, for conservation, may only be brought into operation by petitioning lessees of 50 per cent or more of the area involved.

2. That after hearing and determination by the Corporation Commission that unitized management is necessary, and will prevent waste, and will probably result in greater recovery at no increase in net costs, and that the unitization is for the common good and to the best advantage of all; and after the Corporation Commission has ordered the unitization plan into effect, and after unitized operation has commenced, the order may in effect be "vetoed," and the unitization vacated and abolished by the mere protest against it in 60 days of lessees of 15 per cent of the unit area affected.

3. That the act recognizes only lessees in the formation of the unit, in the percentage that has the veto power in 60 days, and in the committee management of the unit, to the exclusion of any participation therein by the landowners lessors and all others who have fixed interests in the oil being produced and thereafter to be produced.

4. That the act purports to authorize abrogation of contract rights and relieve lessees of contract liabilities and that the unification does abrogate or supersede all contracts between landowner lessors and their chosen lessees, and that is accomplished upon, or by, action of the lessees alone.

5. The same objections as affecting others than original lessors, who have theretofore acquired fixed interests in the oil production.

6. That the act authorizes contingent operating expense liens against royalty interests which theretofore by express contract had been protected against

any such liens and against any share or portion of operating expenses.

7. That by the fixed purpose of the act, and by the unitization, no lessee can get that for which he contracted, that is, his full portion of the oil produced from the tract on which he took his oil and gas lease.

8. That by the fixed purpose of the act, and by the unitization, no landowner lessor can count on receiving that for which he contracted, that is, his fixed share of the oil and gas produced from his land, and the result must be that oil taken or produced from one man's land is used in part to pay royalty to another who owns other and separate land in the unit area.

9. The same objection as applies to others than landowner lessors who have acquired fixed interests as royalty or shares of production.

10. That the act and unitization plan abrogates or nullifies various specific provisions of lessor lessee contracts such as the right to receive delay rentals, rights to free gas for individual use, rights of lessor as against excessive surface use for pipe lines, or such excessive use for tank construction.

11. That as to objecting lessees the act operates to take the oil and gas leases acquired by them and assign or set over such leases to the unit for unitized operation for the benefit of all, thus in direct effect taking private property for private use and private gain without consent of the owner.

12. That as to land in the so-called unit area not leased for oil and gas operation, the act operates to compel the owner to submit his land to drilling operations whether he wishes to do so or not, and that for direct benefit to other private persons or corporations, and that as concerns the owner of any such land the act operates in effect to coerce and compel him to engage with others in the oil production business whether he wishes to do so or not.

To state the above numbered objections would seem to demonstrate that the legislative act and the unitization plan do transgress constitutional provision and do violate constitutional rights.

As to objection number one, the proponents of unitization contend that the act is justified under the police power and as a conservation measure. But that justification and purpose loses much force by the 50 per cent provision above noted. If the state may compel unitization under its police power and for conservation, then why should not such power be exercised without depending upon the will and wishes of 50 per cent of the lessees of the area affected? It would seem that if there is such justification it would exist as well where a majority objected to commencement of the proceedings as in the case where 50 per cent were willing to move forward as petitioners On this point the proponents cite cases upholding "proration" and "spacing." But when the state, acting through the Corporation Commission, exercises those powers, there is no dependence in the first instance upon the assent of 50 per cent.

What we have just said applies with even more force to objection number two. It is a most unusual kind of exercise of police power and exercise of the power of conservation to provide that after the Corporation Commission has investigated and made solemn findings as to necessity, feasibility, applicability to prevent waste, general benefits and common good, and has put into operation the exercise of the police power for conservation, that the whole thing may be nullified by the mere written protest of holders of 15 per cent of the lease rights affected. I am not impressed with the argument that a regulation is so necessary for conservation and of such urgent character as to justify such drastic action under the police power of the state,

and yet be under such control of the persons most affected as to be subject to veto by 15 per cent after it has been implemented by all of the hearings, findings and orders employed to put it into effect.

On this point the proponents of unitization cite cases upholding the Barbers' Act and the Dry Cleaners' Act where prices are fixed by percentage of those most affected. But in those cases the prices fixed are not maximum but are minimum prices and the individual operator is left to operate his own business. In those instances there is no taking over of the individual business and the operation of all such businesses as a unit by one operator, for the so-called general good of all interested parties.

It seems to me that in objections one and two there is demonstrated entirely too much delegation of the legislative power, or perhaps it is better stated, too much delegation of the police power of the state to persons financially interested in the regulation itself, and that on account of such delegation the act and the unitization plan cannot find constitutional sanction.

As to the third objection, while the oil and gas lessees may be said to be the persons most interested in the application of unitization, the landowner lessors and other royalty owners have a fixed interest in the oil being produced and to be produced, and it is pointed out that the act and the plan are so framed as to allow such generous consideration of the lessees with no consideration or participation whatever by lessors or royalty owners. The oil field or source of supply may only be brought into the jurisdiction of the Corporation Commission for application of the state's police power and conservation power by action of 50 per cent of the lessees. When the unitization plan is put into effect it is operated and managed by a committee composed exclusively of the lessees. The advance calculation of the various interests to govern distribution of production was set up by the petitioning lessees. And during the first 60 days of operation of the unit it is to the stated percentage of lessees that the veto power is given. The interests of the lessors and lessees differ only in degree, that is, in percentage of ownership of the production. Equal protection of the law would seem to dictate that such exclusive control could no more be given to the lessees to the exclusion of the lessors than could such exclusive control to be given to the lessors and royalty owners to the exclusion of the lessees. Therefore, the constitutional right to equal protection of the law is violated.

As to objection number four, of course, the act authorizes and the plan effectuates almost complete abrogation of the lease contracts between lessors and lessees. About the only provision of the lease contract which is preserved is the provision as to the ratio of sharing between lessor and lessee, and that provision is not fully preserved if the lease provided for a royalty of more than one-eighth of the oil produced. That provision is not fully sustained for the further reason that in unitization the lessor does not continue to receive the contracted share of the oil produced from his land, but, instead, he receives the contracted share of the percentage of the overall production which is allocated to his land. This may, of course, be more or it may be very much less than the oil produced from his land. Although the overall purpose of the act and of the plan is to increase ultimate production, we cannot say with certainty that every lessor will receive as much compensation or compensation of equal value to him under unitization, as he would under separate drilling and production of his land as he contracted for with his selected lessee.

What I have said also applies to objection number five. And as to both objections four and five it appears that even the royalty share which the owner

was entitled by contract to receive may be reduced by operation of the unitization plan, or at least there may be or may come into existence a lien on some part of the royalty share for operating expenses. Such a lien, or the probability of such a lien, is specifically provided by section 9 of the act, which is section 286.9 supra, and is carried forward by express provision of the unitization plan submitted by the petitioners, and approved by the Corporation Commission.

I observe, of course, that functioning of the well-spacing law or of the proration law operates in some measure to affect the contracts between lessor and lessee. But such effect is only upon what might be the desire of the lessee to drill more wells or the desire of both lessor and lessee to produce oil more rapidly. As to those operations there is nothing like the taking over of contract rights which is here evident. We observe the authorities justifying the abrogation of contract rights in the interest of or in subservience to the police power of the state. But we do not observe authority for such an abrogation of contract rights as is here evident by action of the lessees for their own individual interest. And we are convinced that this act and the unitization plan impair and obrogate contracts and contract rights far beyond any constitutional authorization.

What we have said above disposes somewhat of objection number six, but we should emphasize it with this further suggestion. Though royalty owners, by express contract with the original lessee operator, might be specifically entitled to receive the agreed share of production as royalty, without any part of the operating expense, yet, if the aggregate royalty share exceeds 12 1/2% or 1/8th, the excess would be subject to being burdened with liens for operating expenses if they were not paid by the lessee operator who agreed to pay them. It is pointed out that in case any such royalty owner should be compelled to pay any portion of operating expenses that by subrogation he would have a claim therefor against his contract party who agreed to pay them, but in that I see no fair substitution for the contract right to receive the royalty free of any charges for operating expense.

As to objection number seven, it is clear from the act and the unitization plan that no lessee is to receive the agreed portion of the oil which he may produce from his leased premises. Any plans he may have made for his drilling campaign and production and marketing procedure are necessarily cast aside. In lieu thereof the operator, chosen by a majority of the committee, will develop the lessees' premises as much or as little as they determine. The lessee will be paid not his share of his production or the production from his leased premises, but his share of the predetermined percentage which the calculated productivity of his lease tract bears to the aggregate predetermined productivity of the entire area.

In this action I observe, of course, that if such lessee controls sufficient area he may veto the act and the plan if he does so within 60 days. And in considering purely the economics of the act and plan, it might seem that if more than 85 per cent find the plan wholesome and profitable and desirable, the remaining less than 15 per cent should not be heard to complain. But it has ever been true that constitutional rights have not been sustained or withheld depending upon the service or advantage thereof to majorities. Most often constitutional prohibitions or constitutional rights have been enforced in favor of and for the protection of minorities, no matter how small the percentage so occupied by the minority in question.

What I have said as to objection number seven applies with equal force to objection numbers eight and nine considered in behalf of landowner lessors and other royalty owners. It is inevitable that in many instances the

royalty received must be substantially less than the fixed royalty share of the production from the individual tract of land. It necessarily follows that oil produced from one man's land would be taken in part to pay royalty to another who owned a separate tract of land in the unit area. While this might be justified under some proper type of exercise of the state's police power for conservation, I think clearly it cannot find constitutional sanction in the manner undertaken by this act and this plan as aforesaid.

As to stated objection numbered ten, the rights specially mentioned are rights of value. In Wise v. Tabor, 201 Okla. 428, 206 P. 2d 970, this court recently considered the rights of a surface owner or lessee as against excessive surface use by the oil operator in the construction of storage tanks, and that right was held to be of substantial value, so that a threatened invasion of such right could be prevented by injunction.

As to stated objections numbered eleven and twelve, it must be conceded of course that this taking of private property is accomplished without consent of the owner and results in private use and private gain. But the proponents of this unitization would say that the taking resulted in or was for the joint use and gain of the owner and the others interested in the unit, and that the taking resulted in no loss to the owner, but, on the other hand, resulted in gain to him. That is nothing more or less than to argue that the taking was not without adequate compensation. But the Constitution, in art. 2, sec. 23, prohibits such a taking *with or without compensation.* Thus a violation of this provision cannot be measured by, or condoned on account of, compensation, no matter if the compensation is wholly adequate or even exceeds the value of the property taken. The constitutional inhibition is against such a taking without consent. I submit that a taking in violation of this constitutional provision for the private gain of others jointly with the owner, or such a taking which inures to the benefit of others along with the owner, but against his consent, is just as much a violation as it would be if the taking produced gain solely to others than the owner.

We observe the extensive argument of the overall benefits of the unitized operation of an oil field or a common source of supply. It may be that in the aggregate the production expense would be reduced and the ultimate recovery of oil be increased. It might be that ultimately each lessee would receive as much money or profit as any one of them could receive by regular private operation. It might be that ultimately each contract would return as much in royalty payment as any one contract would return under private operation. We do not understand that it is contended to be certain that every lessee and every lessor will receive as much or more under unitization than he might receive under ordinary separate tract or individual management. If it were so contended it would be based somewhat on theory or speculation. In any event, while those items are interesting they are not controlling on the constitutional question. The most we can say here is that a large percentage of the lessees believe this plan to be wholesome and good, and profitable and desirable; that the percentage of lessees who find and believe the plan unprofitable as to them, and grievously undesirable, and think it to be discriminatory and detrimental to their property interest, is a small percentage comparatively, yet it is a percentage of large financial investment and of large potential oil value. Likewise, the royalty owners who find the plan objectionable and believe it to be unfair, and find the original calculation of percentage of interest to be discriminatory against them and to be inequitable, represent rights and interests which in the aggre-

gate run into a large sum. Indeed, the royalty interests of some of the landowners may mean more to them than the oil company investment in this area would mean to any one of the companies who as lessees initiated this proceeding, calculated percentages of ownership, and who operate the unit.

This is a large oil field. It appears that the interests owned even by small royalty interest owners may be of substantial value. Certainly the interest of every protesting lessee and of every protesting lessor or royalty owner merits full protection. That full protection under our Constitution seems to me to require that each landowner and his lessee be permitted to manage their own premises in drilling for and producing oil therefrom, subject only to reasonable and necessary regulation by the state under its police power. At least, that must be our conclusion as concerns any application of this effort to take over this area under the unitization act and plan here considered.

In this jurisdiction we have always gone forward in the conservation of oil and gas and in the protection of correlative rights. The state, through the Corporation Commission, has extensive power in the prevention of waste. I consider it right that the state should have great power to exercise necessary controls in the production and withdrawal of this natural resource. But surely individual enterprise should be encouraged, and individual property rights and contract rights should be upheld. The state should have much power to regulate, and, insofar as necessary, to restrict and control the production of oil and gas. But it should not be necessary that the state take over production theretofore carried on by landowner and lessee. Much less should it be necessary for the state to authorize a majority group of lessees to take over the operations of other lessees, to the objection and detriment of minority lessees, and over the objection of all royalty owners. We do not mean to say that in this case all of the royalty owners object to this act, or to this plan of unitization, but as we read the act it would make no difference if every royalty owner did object and complain.

On this point it is somewhat significant that some lessees and some royalty owners desire this unitization while other lessors and other lessees object and protest. It would seem inevitable that in final analysis some lessees will obtain a greater return by unitization than they would without it, and that inevitably some lessees will receive less return with unitization than they would without it. The same applies exactly to landowner lessors.

In Carter v. Carter Coal Co., 298 U. S. 238, 80 L. Ed. 1160, the court considered the Federal "Bituminous Coal Conservation Act of 1935" and held the act unconstitutional for some of the objectionable features which find parallel in the state act here considered. In the opinion (L. Ed. 1189) the court said:

"The power conferred upon the majority is, in effect the power to regulate the affairs of an unwilling minority. This is legislative delegation in its most obnoxious form; for it is not even delegation to an official or an official body, presumptively disinterested, but to private persons whose interests may be and often are adverse to the interests of others in the same business. . . ."

This language applies with force to the provisions of this Act which confer power upon the majority in the first instance to say whether the Corporation Commission shall ever acquire jurisdiction. If that is legislative delegation in a very obnoxious form, then how would we characterize the more obnoxious delegation to 15 per cent of the operators to nullify the whole proceedings by a mere protest in 60 days? This protest they may make without showing any reason therefor, or for any reason or for no reason.

In Washington ex rel. v. Roberge, 278 U. S. 116, 73 L. Ed. 210, the Supreme

Court considered an ordinance in reference to the location of a philanthropic home for children or old people when two-thirds of the owners of property within 400 feet should consent. The superintendent who passed upon applications for building permits denied the application to build such a home solely because of the applicants' failure to furnish such consents, and in reference to the ordinance the court said, on page 214 L. Ed., as follows:

"The superintendent is bound by the decision or inaction of such owners. There is no provision for review under the ordinance; their failure to give consent is final. They are not bound by any official duty, but are free to withhold consent for selfish reasons or arbitrarily, and may subject the trustee to their will or caprice. Yick Wo v. Hopkins, 118 U. S. 356, 366, 368, 30 L. Ed. 220, 225, 226, 6 Sup. Ct. 1064. The delegation of power so attempted is repugnant to the due process clause of the 14th Amendment. Eubank v. Richmond, 226 U. S. 137, 143, 57 L. Ed. 156, 158, 42 L. R. A. (N.S.) 1123, 33 Sup. Ct. 76, Ann. Cas. 1914B, 192; Browning v. Hooper, 269 U. S. 396, 70 L. Ed. 330, 46 Sup. Ct. 141."

Applying that rule to the act before us, the Corporation Commission is bound in the first instance by the decision or inaction of 50 to 51 per cent of the oil operators or lessees. The state, acting through the Corporation Commission, may not take an initial step toward this exercise of the police power for conservation of oil until and unless 50 per cent of the operators will it to be so. Thus, 51 per cent or 50 per cent plus, may in every instance prevent even the inception of a proceeding looking toward conservation of oil and gas by unitized operation.

And as to continuing jurisdiction of the Corporation Commission and as to continuation of the operation under unitization, the Corporation Commission is bound for 60 days by the decision or inaction of lessees of 15 per cent of the area. The lessees or operators above mentioned, in exercising their

preference or their will in the instances above stated, are not bound by any official duty, but are free to act or withhold action for private or selfish reasons or arbitrarily, and to the extent just noted they may in fact subject the unitization proceedings to their will or caprice.

It seems clear to me that this court should conclude this delegation of power so attempted to be repugnant to the due process clause of the Constitution.

In Eubank v. City of Richmand, 226 U. S. 137, 57 L. Ed. 156, the Supreme Court considered a city ordinance enacted under a statute of Virginia, which ordinance provided, in substance, that when the owners of two-thirds of property abutting on any street should request it, a committee on streets should establish a building line not less than 5 nor more than 30 feet from the street line, with provision for penalty for violation of such property line establishment. The state court upheld the legislation, but the United States Supreme Court held that it violated the 14th Amendment to the Federal Constitution in that such enactment amounted to a deprivation of property without due process of law, and denied equal protection of the law.

Applying that rule here, I must conclude that this act is equally invalid. It deprives operators and landowners of property without due process of law, and it likewise deprives some operators and all of the landowners or owners of royalty interests of equal protection of the law.

While the original 50 per cent petition requirement, standing alone, would not or might not invalidate the act, it must be considered along with the other provisions as to the 15 per cent veto power, and as to complete exclusion of all others than lessees. When so considered the 50 per cent petition provision is some indication or demonstration of the overall length to which the act goes. And when all provisions of the act are considered, we must

hold that the length to which it goes transcends legal and constitutional authority.

As touching upon these points our attention is directed to various provisions included in our statutes under the title on "Waters and Water Rights." (Title 82 O. S. 1941) Those provisions deal with the making of various property improvements, such as irrigation, drainage, flood prevention, stream channel control, land reclamation, and the like, and the construction of public water works. Since the cost of such improvements must be borne by the property owners or persons interested, they are given voice as to whether the project shall exist or not. Those provisions bear no strict analogy to the act here involved. Those provisions are more nearly analogous to principles or provisions of general government where the will or wishes of the people govern, as in the creation of some of our municipal subdivisions or the voting of bonds for improvement or utilities.

For the reasons stated, we conclude that the act violates art. 2, sec. 7, of the Constitution, in that said act operates to deprive persons of property without due process of law, and said act violates art. 2, sec. 15, of the Constitution, in that it operates to impair the obligation of contracts, and said act violates art. 2, sec. 23, of the Constitution, in that it operates to take or damage private property for private use, and specifically authorizes the taking and using of private property for private gain without consent of the owner, and said act violates art. 2, sec. 24, of the Constitution, in that its operation purports to take private property for public use without just compensation, and said act violates art. 4, sec. 1, and art. 5, sec. 1, of the Constitution, in that it purports to accomplish an unauthorized delegation of the legislative power and of the police power of the state.

It is suggested the conclusion that this compulsory Unitization Act is un-

constitutional might destroy or deny or in some manner impinge upon the power of the Legislature generally to regulate the coequal rights of owners or operators to take oil and gas from a common source of supply. However, such result would in no sense be accomplished or indicated or intended. The Legislature does have such power, including the power to make private contracts conform to or submit to the necessary police power of the state, and has well exercised that power in providing for "well spacing" and "proration," and in making the various other provisions under which the taking of oil and gas by any and all persons entitled to take it is regulated. This case concerns only the authority of the Legislature to deal with such conservation and such rights *in the manner in which this act deals with such* subjects. In that consideration the test is whether the act is violative of constitutional provisions. This court must not substitute court views for legislative views as to methods of conservation or protection of coequal rights, but this court must discharge its duty to measure this act by the constitutional requirements as to the protection of all rights.

No decision is cited which has upheld such an act or anything like it.

I am authorized to say that Mr. Vice Chief Justice LUTTRELL, and Mr. Justice DAVISON and Mr. Justice O'NEAL concur in this dissent.

DAVISON, J. (dissenting). I concur in the dissent written by Mr. Justice WELCH.

I believe the majority opinion goes much farther than any opinion ever written on the subject of conservation under the police power of the state. If the Act in question and the order of the Corporation Commission thereunder can stand at all, it is only because of the proper exercise of police power for the conservation of oil and gas and the prevention of waste thereof. Many decisions hold, however, that

such power must be reasonably exercised, and that private rights should not be interfered with to a greater extent than is reasonably required by a proper exercise of the power, taking into consideration the legitimate object to be accomplished. Grison Oil Corp. et al. v. Corporation Commission, 186 Okla. 548, 99 P. 2d 134. Under the record involved herein, I am of the opinion that the power exercised by the Corporation Commission is unreasonable, unjust and unfair.

O. S. A. Title 52, section 286.6 of the Act in question, provides as follows:

"If at any time after the filing of a petition for the creation of a unit and within sixty (60) days after the entry of an order by the Commission approving the creation of the same, lessees of record of fifteen percent (15%) or more of the proposed unit area, if prior to the entry of the order by the Commission, or lessees of record of fifteen per cent (15%) or more of the unit area as defined by the approved plan of unitization and order of the Commission, if after the entry of such order, shall file written protest with the Commission against the creation of the unit, the Commission shall vacate all action of any kind theretofore taken and dismiss the proceedings for the creation of such unit."

This provision of the Act denies lessors equal protection of the law. The Act gives a percentage of the lessees alone the opportunity to instigate proceedings for a proposed unit area, and at the same time affords 15 per cent of the lessees the right to nullify the proceedings. It therefore gives the lessees the vehicle to promulgate a unit area, and in the same clause gives the lessees another vehicle with which to backpedal therefrom and annul all proceedings thereunder. By this provision it appears the Act creates an improper delegation of the police power and legislative power of the state to the will and opportunities of oil operators or lessees. The Act is therefore legislation which benefits the individual lessees and operators rather than being a conservation measure.

The cases relied on in the majority opinion involve the pooling or spacing of small or irregular shaped tracts, while the unit involved herein covers approximately 3,700 acres of land consisting of 72 separately owned tracts with several hundred royalty owners.

I am of the opinion that the Legislature, by the passage of the referred to Act, has created a Frankenstein, under the guise of conservation.

O'NEAL, J. (dissenting). I agree with the views expressed by Mr. Justice WELCH in his dissenting opinion.

It is my judgment this unitization act under the guise of preventing waste in the production of oil and gas from the earth transcends, to an unwarranted and unreasonable degree, regulation of the production of natural resources, and enters the forbidden zone of taking property out of the hands of the owners and placing it in the hands of third persons as individuals and not as a state instrumentality for the purpose of operation, without the consent of and in violation of their rights.

As I view this Act, it is an improper, unjustified and illegal delegation of police power by the state to private individuals, or corporations acting in a private capacity, as distinguished from acting in the capacity of a duly constituted state instrumentality, answerable to the state. It may be that the state may create a state instrumentality and vest it with the police power for such purpose, making it answerable to the state for its activities and results, but certainly the state has no power under its Constitution, or the Constitution of the United States, to delegate the police power to private individuals or private corporations for such a purpose, or for that matter, any purpose.