# WEST EDMOND HUNTON LIME UNIT v. STANOLIND OIL & GAS CO.

## No. 4270.

United States Court of Appeals
Tenth Circuit.

Dec. 21, 1951.

Rehearing Denied Jan. 16, 1952.

Writ of Certiorari Denied April 7, 1952.

---

T. Murray Robinson, Oklahoma City, Okl. (George Hazlett, Cleveland, Ohio, on the brief), for appellant.

W. W. Heard, Tulsa, Okl. (L. A. Thompson, Jr., Tulsa, Okl., and Norton Standeven, Oklahoma City, Okl., on the brief), for appellee.

Before BRATTON, HUXMAN and MURRAH, Circuit Judges.

MURRAH, Circuit Judge.

Pursuant to and in accordance with the provisions of the so-called Unitization Act, Title 52 O.S.A. §§ 286.1 to 286.17, the lessee-operators of separately owned oil and gas leases in the West Edmond, Okla-

homa oil field entered into an agreement, effective October 1, 1947, for the "unitization, management, operation and further development" of 741 forty acre tracts of land, on 737 of which was located a producing well in the Hunton lime formation. The unitization agreement, as duly approved by order of the Oklahoma Corporation Commission, created an operating unit (a body politic and corporate) with a unit plan, under which, upon its effective date, the unit assumed "control and management of the further development and operation of the unit area", and providing further that "each lessee within the unit area shall deliver possession to the unit operator of (a) all wells within the unit area; (b) all lease and other operating equipment used in the operation of such wells; * * *."

On the effective date of the plan, five of the wells in the unit area had been dually completed to produce oil, gas or distillate. from both the Hunton lime formation and the overlying Bartlesville sand formation. This result was accomplished by the use of a packer between the tubing and the casing to seal off the interval between the two formations, thus permitting the operator to produce the Hunton through the tubing and the Bartlesville through the annular space between the tubing and the casing. The owners of these wells, whose equipment had been turned over to the unit operator for production from the Hunton formation, continued to produce the wells from the Bartlesville formation, after they had been ordered by the unit operating committee to discontinue the Bartlesville production and "turn over the well completed in and capable of producing from the Hunton lime reservoir only."

Claiming the exclusive right to the use of the well bore and equipment for the management, operation and development of the Hunton formation in the unit area, the unit, in its corporate capacity, brought this and similar suits against the dually completed well owners in the state court, to enjoin each of them from using the well bore and equipment for the production of oil and gas from the Bartlesville formation, and to compel them to turn over the wells to the unit for its exclusive use. The several

suits were removed to the federal court on diversity of citizenship and requisite amount in controversy, both of which are concededly present. The trial court denied relief in each case and entered judgment for the well owners. The unit has appealed only this case, and the parties to the other suits have stipulated that the unappealed judgments will abide the final results.

In conformity with authorizing legislation, the unit plan (Section XII) provides that each separately owned tract with a producing Hunton well on the effective date of the unitization agreement, is given credit for a producing well with a value of $50,000, representing intangible cost and exclusive of appurtenant equipment. This sum, multiplied by the total number of Hunton wells in the unit area, represents the unit well investment. Each of the four separately owned undrilled forty acre tracts within the unit is charged with its percentage of the total well investment, with interest, and the said charges are treated as other unit expense.

All lease and operating equipment used in the operation of the wells taken over by the unit, such as casing, tubing, derricks, tank batteries, rods, pumps, flow lines, water lines, and gas lines was "delivered to and taken over by the unit." All other equipment not taken over remains the separate property of the several well owners. The unit is required to account to the respective well owners for the value of the inventoried equipment according to a prescribed formula, and each lessee or well owner is given credit for its adjusted value to the end that after the effective date of the unit plan, "each of the several lessees within the unit area, instead of separately owning the equipment delivered to the unit by such lessees will have exchanged the same for an undivided interest in and to all the said equipment so taken over and acquired by the unit, and will have paid or have been paid, as the case may be, for any difference in value." In other words, the value of the well owners' equipment is used to purchase an undivided interest in all of the wells and equipment included in the unit area. Thus, the percentage ownership of participation for the well in question is

.03346428, and Stanolind's total investment in the unit gave it 9.77441400 interest in the unit wells, equipment and production.

The plan of unitization had the effect of unitizing all further development and operations for the production of oil and gas from the Hunton lime formation in the unit area, and of pooling and unitizing the production so obtained "to the same extent as if the unit area had been included in a single lease and all rights thereunder owned by the lessees in individual interests", and all property rights and obligations in respect to the separately owned tracts within the area were amended and modified to the extent necessary to give effect to the plan of unitization. Nothing contained in the plan, however, is to be construed to require or result in a transfer to or the vesting in the unit the title to the separately owned tracts within the unit area "other than the right to use and operate the same to the extent set out in this plan of unitization; nor shall the unit be regarded as owning any of the unit production. The unit production and the proceeds from the sale thereof shall be owned by the several persons to whom the same is allocated under this plan of unitization. All property, real or personal, acquired, held or possessed for use in the operation of the unit area shall be the property of the lessees as their interest may appear under this plan of unitization, subject however, to the rights and powers herein granted the unit and the unit operator." The unit is operated by a designated operator under the direction of an operating committee, composed of the separate tract owners, with a voting interest equal to the respective unit ownerships.

In addition to the foregoing agreed basic facts, the trial court found that upon the effective date of the unit plan, the unit acquired and accepted the dually completed well for the restricted purpose and privilege of producing it in the Hunton lime formation; that 85 of the wells in the area, including this one, with high oil gas ratio, had been shut in since the effective date of the plan as being inefficient producers, but that continued production from the Bartlesville sand had nothing to do with such action; that on the contrary, the unit had been entirely free to produce the dually completed wells without interference and had so produced them for testing purposes. In sum, the court could find no evidence that the Bartlesville sand operation interfered with the Hunton operation in any way. It affirmatively found that the dual production was feasible and without difficulty, and that the shutting in of the Bartlesville sand, requiring the drilling of a separate well to that formation, was "hazardous, unnecessary and a waste of equipment and money." Specifically, the court found that if injunctive relief was granted, it would cost Stanolind $9,700 to plug off the Bartlesville sand in the well, and $70,000 to drill a separate well; that if a separate well was not drilled, Stanolind would lose the value of the gas and distillate in the Bartlesville sand, estimated at $95,000. The court took the view that if injunctive relief was not granted, the unit would suffer no damage, but that in any event, if continued Bartlesville production totally destroyed the Hunton production, the unit would, according to the stipulated testimony, lose Hunton production with a value not to exceed $5,600.

The court's judgment is based upon the premise that under the terms of the unitization agreement, the unit acquired possession of the well and equipment only to the extent reasonably necessary to produce the Hunton lime formation in the area; and that all rights not expressly granted to the unit under the terms of the plan are reserved to Stanolind, to freely exercise so long as it does not invade or threaten to invade the rights granted to the unit. The court reasoned that neither exclusive possession nor exclusive right of operation of the well and equipment is necessary to carry out the purposes for which the unit was formed, and under the facts in this case, would be in excess of its authority. Applying the doctrine of "balancing of conveniences and comparative injury," the court denied injunctive relief because "the injury which would follow to the defendant by the granting of the injunction would be too great when compared to the benefit, if any, to the plaintiff."

822

On appeal, the unit reasserts its position in the trial court, to the effect that under the plain language of the plan of unitization, it acquired the exclusive possession and the exclusive right to the use of the well and well equipment; that Stanolind, having signed the unitization agreement and joined the plan, is bound thereby and therefore estopped to use the well or equipment thereon for any purpose, whether it constitutes an interference with the unit operation or not. It is said that the delivery of possession of the well and equipment for unit operation necessarily excluded the possession and operating rights of all others. On this postulate, the unit argues that the doctrine of comparative injury has no application. It claims to seek only the enforcement of a contractual right for which it has no adequate remedy at law. Finally, it is said that in any event, Stanolind's asserted right of joint use and possession of the well and equipment does actually interfere with the unit's paramount right of possession and use of the equipment in order to carry out the purposes for which the unit was formed and empowered to effectuate.

In support of the judgment and reasoning of the court, Stanolind takes the position that it is entitled to the use and possession of the well and equipment in question in producing the Bartlesville sand formation, while the unit is entitled to the use and possession of the same well and equipment in the production of the Hunton lime formation exposed in the same bore hole. Emphasis is placed upon the provisions of the unit plan which unitize only the Hunton formation and no other, leaving, by its specific terms, unaffected, the lessee's rights to all other producing formations within the unit area, "except that in the exercise of such rights, the owners thereof shall have due regard for the rights granted to the unit with respect to its operations hereunder." Stanolind points to the impenetrability of the interval between the two producing sands, and to the fact that the installation of the packer effectively seals off the production from the two formations in a manner to permit the production of both from the same well bore at a cost of

approximately $3,000, whereas it would cost $70,000 to complete a separate well to the Bartlesville sand. Without denying that it conveyed and delivered to the unit the possession of its well and equipment to the extent reasonably necessary for the operation of the Hunton lime, it says, as did the trial court, that the exclusive possession and use of the well and equipment is not reasonably necessary to the efficient operation of the unit plan, is not in conflict therewith, and therefore not subject to unit control. Our attention is called to the fact that the well in question, because of its high oil and gas ratio, has been shut in almost since the inception of the plan, together with 81 other like wells, except for infrequent testing periods. And then, invoking the doctrine of comparative injury, we are reminded that the complete destruction of the well would result in comparatively little damage to the unit.

■ We think it of first importance to consider that the unit was formed under sanction of legislation designed to provide for the unitized management, operation and further development of a common source of supply "to the end that a greater ultimate recovery of oil and gas may be had therefrom, waste prevented, and the correlative rights of the owners in a fuller and more beneficial enjoyment of the oil and gas rights, protected." Sec. 286.1. Before the plan of unitization became effective under the statute, the Oklahoma Corporation Commission, to which is committed jurisdiction, power and authority to supervise the administration of the Act, Sec. 286.3, first found that the unitized management, operation and development of this common source of supply is reasonably necessary for the efficient production of the pool according to the best engineering methods, and that the proposed method of operation is feasible, will prevent waste and probably result in the increased recovery of oil and gas from the common source of supply; that the estimated additional cost of the operations will not exceed the value of the additional oil to be recovered; and that the unitization and the adoption of the unitized method of operation will be advantageous to the owners of

the oil and gas rights within the area. In accordance with the statute, the plan unitized only the Hunton lime formation, and provided for the "efficient unitized management or control of the further development and operation of the unit area * * *" by a unit operator, designated by a vote of the lessees in the unit. Sec. 286.5(a). And, as we have seen, it provided the procedure and the basis upon which the wells, equipment and other properties of the lessees within the unit area "are to be taken over and used for unit operations". Sec. 286.5(d). Also in obedience to the statute, the plan provides for the "creation of an operating committee to have general overall management and control of the unit and the conduct of its business and affairs and the operations carried on by it, together with the creation or designation of such other subcommittees, boards or officers to function under authority of the operating committee as may be necessary, proper or convenient in the efficient management of the unit, defining the powers and duties of all such committees, boards or officers and prescribing their tenure and time and method for their selection." Sec. 286.5(e). It can thus be seen that the rights and powers vested in the unit by the unit agreement are not only derived from the agreement itself, but from the statute which authorized its promulgation. It follows that in the performance of its functions, the unit not only acts under authority of the private contract, but under color of statutory law as well.

The Unitization Act is an innovation in conservation law. The Oklahoma courts have sustained its constitutionality as a permissible delegation of police power. Palmer Oil Corp. v. Phillips Petroleum Co., 204 Okl. 543, 231 P.2d 997; Spiers v. Magnolia Petroleum Co., (3 cases) Okl., —— P.2d ——, ——, ——. But, they have not been called upon to define with precision the scope of the unit's power and authority to operate the properties under a unitization agreement.

■ From an examination of this unit plan, as an embodiment of the statutory scheme, we think it is clear that the agreement contemplated that the wells and appurtenant equipment would be turned over to the unit for the production of oil from the Hunton Formation, under the direction of an operating committee; that the right of possession thus acquired by the unit was qualified in the sense that it was based upon the right of use, not of ownership. By force of the statute, the property turned over to the unit is held and possessed by it for the account and as agent of the several lessees. And, it remains the property of the lessees as their interest may appear under the plan of unitization, "subject, however, to the right of the unit to the possession, management, use or disposal of the same in the proper conduct of its affairs * * *." Sec. 286.10. We agree with the trial court that all rights in the property not expressly granted to the unit in the property turned over to it are reserved to the lessees; and that the unit was granted possession of the well and equipment only to the extent reasonably necessary and appropriate to efficiently manage, operate and further develop the unitized area in the Hunton lime formation. But, we entertain no doubt that the possession and right of use granted to the unit by the terms of the plan is entirely sufficient to enable it to carry out the purposes for which it was created, that is, the efficient management operation and further development of the Hunton lime formation; that the right of use thus conferred is paramount to any other use of the equipment dedicated to the unit. To attribute to the unit any less power or authority would render it impotent to perform the very functions for which it was created.

■ The salient inquiry is therefore whether the continued operation of the dually completed wells from the Bartlesville formation interferes with the convenient management, operation and further development of the unitized zone. This inquiry in turn raises the all important, and we think decisive, question of who shall say when such operations constitute an abatable interference. To be sure, the decision is not committed to the owners of the dually completed wells, for they have delegated the responsibility of operating the unit to the unit operator, with a voice in its affairs

commensurate with its proprietary interest in the area. Certainly it is not for the court to judge the gravity of the interference, for the courts do not operate the unit, and in weighing the extent of the interference, it cannot substitute its untechnical judgment for the expert opinion of those to whom has been entrusted the responsibility for operating the unit in the public, as well as the private interest. The province of the court, whose equitable processes are invoked, must therefore be limited to a determination whether the asserted power is arbitrary, capricious and without any rational basis in fact.

The record shows that at the organizational meeting August 20, 1947, before the unit plan finally became effective on the following October 1, a resolution was introduced to permit the operators of the dually completed wells in the unit area to continue to use well facilities to produce the Bartlesville sand, it being understood that the use of the facilities for such purposes during this sixty day period would not jeopardize the lessees' interest in the unit. The resolution further moved that the unit operator consider the problem of dually completed wells and recommend to the operating committee a course of action to be followed in connection with these wells which would protect the best interests of the unit and cause the least inconvenience or damage to the owners of the dually completed wells. The record does not reflect the disposition of this resolution, but at a meeting of the operating committee on the next September 24, on recommendation of the executive committee, a resolution was adopted permitting the operators of the dually completed wells to continue the use of that part of the well facilities necessary to produce the Bartlesville sand until December 1, 1947, provided the wells could be produced in a manner "satisfactory to the unit operator." The resolution further recommended that the unit operator recommend to the operating committee within this period a course of action to be followed in connection with these wells after December 1, 1947.

When the matter of the operation of the dually completed wells was again before the operating committee on November 25, 1947, the authority to continue to produce the Bartlesville sand was extended to January 31, 1948. The matter was next considered at a meeting of the operating committee on February 3, 1948, when the authority was extended "while efforts are being made to arrive at a mutually satisfactory arrangement for the use of unit wells by the owners of Bartlesville sand production"; and it was agreed that the operators should have the right to have the matter considered by the operating committee before this authority would be revoked.

The matter again came before the operating committee on May 3, 1949, when a resolution was offered reciting the previous action of the committee with respect to the continued operation of the dually completed wells, and also reciting that whereas other separately owned tracts within the unit area contain or believed to contain productive sections of Bartlesville sand formations, from which production might be obtained through completion in the formation of unit wells also completed in the Hunton lime formation; that all the unit wells which might be recompleted for production from the Bartlesville sand formation cannot be abandoned by the unit without loss of a substantial amount of production from the Hunton lime formation; and that the abandonment of all of the unit wells which might be recompleted for production in the Bartlesville sand formation would result in discrimination among the lessees of the unit. The resolution went on to move that the authority heretofore granted the operators of the dually conpleted wells to continue to use the well for production from the Bartlesville formation be terminated, effective August 1, 1949, and on or before that date the dually completed wells be surrendered to the unit operator with the Bartlesville formation sealed off and in a suitable condition for production from the Hunton lime formation. This motion lost by a majority of the voting interests, but a resolution was unanimously adopted authorizing the appointment of a five-man sub-committee to study the problem of the dually completed

Bartlesville-Hunton wells, and to make its report and recommendations for the solution of the problem to the operating committee at the next meeting.

In its report to the operating committee, the five-man sub-committee recommended that "possession of the five dually completed wells be surrendered to the unit operator and production from the Bartlesville sand ceased from these five wells." It also recommended that "other wells that may be productive of the Bartlesville sand should not at any time be out of possession of the unit or the unit operator until such time as the operating committee decides to abandon any well." This recommendation was adopted by sixty-five per cent of the voting interests in the unit. Pursuant to this authority, the unit operator directed Stanolind to deliver to the unit within ninety days its well completed and capable of producing only from the Hunton lime reservoir. The refusal of Stanolind to do so is the basis of this suit.

On the trial of the case, one of the witnesses for the unit, a petroleum engineer, testified that one of the reasons the well in question had not been producing from the Hunton lime was the inconvenience caused by having two operators "going to the same well head," and that because it had not been necessary to produce all the wells, this well had not been produced for the convenience of the unit operator. He went on to say, however, that with the decreasing pressure in the unit area, the unit operator, in his judgment, would be required to produce a greater number of wells. After detailing the mechanics of the dual completion, the witness was asked if such method of completion added any hazards to the production of the lower formation, and he was permitted to testify that there were a number of added hazards, one of which occurred when it became necessary to rework or reacidize the lower Hunton lime formation. In that event, he stated, it became necessary to unseat the packer, and to fill the well bore with mud-laden fluid. He explained that the bottom hole pressure in the Hunton lime horizon would not support the fluid weight necessary to keep the Bartlesville sand, with a greater rock pressure, from coming to the surface in a workover operation. If this should happen, he said, the mud-laden fluid would permeate the Hunton lime horizon, with the consequent possibility of rendering the Hunton lime incapable of further profitable production. He went on to say that it had been necessary to work over many wells in the unit area. The witness also testified that there was a water flood project in progress in which the Hunton lime water was reinjected into the Hunton lime wells, for the purpose of determining whether that method would increase the oil which the lessees might recover. He expressed the view that this water drive might necessitate the plugging back of part of the productive horizon exposed in the well in question.

There was other testimony tending to support the action of the operating committee, but this is enough, we think, to show that it was not arbitrary or capricious, but founded upon the technical knowledge and judgment of those charged with the duty and responsibility of managing and operating the unit. The trial court's refusal to grant equitable relief is based, partially at least, upon its findings, supported by the record, that the complete destruction or elimination of the dually completed wells would result in only a nominal loss of production from the area. But the rights of parties are not governed by comparing the pecuniary loss to one party and the benefit to another, where, as here, the rights of the parties are founded in contract and are sufficiently explicit. 28 Amer. Juris. Injunctions, Sec. 55. If the rights and duties of the parties are fixed by contract, it is not the question of convenience or inconvenience, or the comparative amount of damage or injury resulting from the enforcement of the right. It is the specific performance by the court of that bargain which the parties have made, with their eyes open. Lindsay v. James, 188 Va. 646, 51 S.E.2d 326, 333, 7 A.L.R.2d 597. This is especially true, we think, when the contract the parties have made, and which is sought to be enforced, is affected with a public interest. We think the rights and duties of the parties are clear and unmis-

826

takable. The action of the unit is responsive to the judgment of the operating committee. The unit has no adequate remedy at law, and it is therefore entitled to invoke equitable processes in the enforcement of its rights, duties and obligations conferred upon it by the plan of unitization.

The judgment of the court is reversed with directions to grant the relief sought.