**PETER FOX BREWING COMPANY et al., Plaintiffs-Appellants,**

v.

**SOHIO PETROLEUM COMPANY et al., Defendants-Appellees.**

**No. 13348.**

United States Court of Appeals Seventh Circuit.

Nov. 30, 1961.

counting in accord with such reformed agreements. In a separate count, plaintiffs sought a judgment for violation of the express terms of the agreements.

The cause was tried to the court without the intervention of a jury. The opinions, findings and conclusions of the district court, denying the relief sought, are reported in Peter Fox Brewing Co. v. Sohio Petroleum Co., D.C.N.D.Ill., 189 F. Supp. 743 (1960). This appeal followed.

The facts were largely stipulated and may be summarized as hereinafter set out.

Early in 1943, plaintiffs acquired oil and gas leases on 2400 acres of land in Oklahoma in return for their contribution to the drilling of the discovery well in what became known as the West Edmond Field. This field is one of the largest in Oklahoma.

In June, 1943, after completion of the discovery well in the Hunton Lime Formation, plaintiffs were approached by defendant with respect to an assignment to defendant of plaintiffs' West Edmond leases. These discussions resulted in the signing of an agreement on July 2, 1943 under which plaintiffs were to assign a number of their leases to defendant; defendant was to bear the cost of drilling and developing; and plaintiffs were to receive a percentage of the profits and contribute a percentage of the operating and overhead expenses. Apparently neither plaintiffs nor defendant has retained a copy of this executed agreement; for none was produced at trial.

Upon the advice of tax counsel, that the July 2nd profits interest agreement was not an interest in oil and gas and would not qualify for depletion allowance,

Ernest Greenberger, A. Bradley Eben, Joseph P. Antonow, Chicago, Ill., for plaintiffs-appellants, Richard A. Siegal, Chicago, Ill., of counsel.

George W. Hazlett, Cleveland, Ohio, George J. O'Grady, Chicago, Ill., for appellees, McAfee, Hanning, Newcomer & Hazlett, Cleveland, Ohio, Ross, McGowan & O'Keefe, Chicago, Ill., of counsel.

Before HASTINGS, Chief Judge, and DUFFY and CASTLE, Circuit Judges.

HASTINGS, Chief Judge.

Plaintiffs [1] (appellants) brought this diversity action for reformation of two agreements between plaintiffs and defendants [2] (appellees), relating to oil and gas leases in Oklahoma, and for an ac-

1. Of the original plaintiffs (Peter Fox Brewing Company, The Northern Trust Company, as trustee, Herbert J. Schmitz and David Waller Dangler), only Herbert J. Schmitz remains a party. The interests of the other three original plaintiffs were transferred during the pendency of this action to Christiana Oil Corporation, Tekoil Corporation and Schmitz Oil Company, who were substituted as plaintiffs.

Plaintiffs William J. Fox, Frank G. Fox and Margaret Olive Fox became parties to this action on October 30, 1959. The interests of plaintiffs are common, and they will be referred to as "plaintiffs."

2. Defendants are Standard Oil Company and its subsidiary, Sohio Petroleum Company. Both defendants will be referred to as "defendant," Standard having transferred its entire interest to Sohio.

plaintiffs requested that this agreement be canceled. Defendant acquiesced, and negotiations were reopened.

A draft of a proposed new agreement was submitted to plaintiffs on August 3, 1943. This draft called for plaintiffs to receive as an overriding royalty one-half the proceeds of working interest production less (a) $150 per well per month or $187.50 per well per month in the case of a well producing more than 10% water and (b) one-half the cost of acidizing, deepening, plugging back, shooting or reconditioning wells. In addition, it imposed on plaintiffs the personal obligation to pay one-half the cost of the third, fourth and sixth dry holes. This draft still left some doubt concerning the availability of the depletion allowance to plaintiffs.

A final agreement was signed on August 20, 1943, assigning a part of plaintiffs' leases to defendant and reserving an overriding royalty interest therein. The pertinent parts of this agreement are as follows:

"(4) The assignments to be executed and delivered by Fox to Standard or its nominee hereunder shall expressly reserve to Fox, and Fox does hereby expressly reserve an overriding royalty (free and clear of all development and operating expense), with respect to all of the leases listed and described in Exhibit 'A' hereof as a group, of one-half of the crude oil, gas, casinghead gas, and other hydro-carbons produced, saved, and marketed from said leasehold premises or the proceeds thereof accruing to the working interests assigned and transferred hereunder to Standard or its nominee, subject, however, to a deduction from said one-half (½) of the following items:

\* \* \* \* \*

"(b) That quantity of crude oil, gas, casinghead gas, and other hydro-carbons, or the proceeds thereof, which, at current well market prices at the time of sale thereof, shall be equal in value to $200.00 per each producing well per month except that in the event that any well producing oil in paying quantities shall at the same time produce water in excess of 10% of the total fluid produced from the well, then as to that well during any such period while such condition shall exist the deduction shall be that quantity of crude oil, gas, casinghead gas, and other hydro-carbons, or the proceeds thereof which at current well market prices at the time of sale thereof shall be equal in value to $250.00 per month.

\* \* \* \* \*

"(5) Except for the purpose of making necessary repairs to equipment or the performing of any reconditioning work on any well, Standard agrees that no producing well shall, during any period so long as the same is producing oil and/or gas in paying quantities, be shut in unless pursuant to an order, rule or regulation of any officer, board, or agency, state or federal. Standard further agrees that all producing wells hereafter drilled on the aforesaid properties will be operated at all times in such manner as to produce at the maximum rate of production allowed from time to time by the state or federal authority having jurisdiction."

On February 15, 1944, plaintiffs assigned additional leases to defendant under an agreement which, insofar as it relates to the present controversy, is identical with the agreement of August 20, 1943. Both instruments will be referred to as "the agreements." In October, 1947, at plaintiffs' instance, defendant eliminated the additional $50 per month deduction for wells which produced more than 10% water.

Between 1943 and 1945, Hunton Lime wells were drilled on all 23 tracts involved here. Plaintiffs' overriding royalties were computed on the basis of one-half of the seven-eighths of the oil and gas actually produced, less production

equal to $200 per well per month and $250 for wells producing more than 10% water.

Up to October 1, 1947, the Hunton Lime formation in the West Edmond Field had been developed under "spacing" orders issued by the Oklahoma Corporation Commission in the exercise of its statutory authority. These orders prescribed forty-acre "spacing" or "drilling" units each of which consisted of a quarter-quarter section of land. The first order, issued July 19, 1943, was confirmed by the Commission on July 13, 1944. These orders prohibited the drilling of more than one Hunton Lime well on a quarter-quarter section. In addition, the order of July 13, 1944 imposed restrictions on the basis of a gas-oil ratio on the production of oil from the permitted wells, in an effort to conserve the gas energy of the reservoir.

On October 1, 1947, the West Edmond Field was unitized under the Unitization Statute of Oklahoma [3] (the Act), enacted in 1945. Under unitization, each quarter-quarter section within the Field was treated as a separately owned tract. Each tract was assigned a percentage interest in total unit production, and total unit production was apportioned accordingly. Unit operating expenses were likewise apportioned according to percentage interest. All tracts were operated in the West Edmond Hunton Lime Unit collectively in order to achieve maximum ultimate unit production at a minimum unit expense with the least amount of unit waste of natural resources.

The relevant portions of the Act are as follows:

"Property rights, leases, contracts, and all other rights and obligations shall be regarded as amended and modified to the extent necessary to conform to the provisions and requirements of this Act and to any valid and applicable plan of unitization or order of the Commission made and adopted pursuant hereto, but otherwise to remain in full force and effect." [4]

"The amount of the unit production allocated to each separately-owned tract within the unit, and only that amount, regardless of the well or wells in the unit area from which it may be produced, and regardless of whether it be more or less than the amount of the production from the well or wells, if any, on any such separately-owned tract, shall for all intents, uses and purposes be regarded and considered as production from such separately-owned tract, and, except as may be otherwise authorized in this Act, or in the plan of unitization approved by the Commission, shall be distributed among or the proceeds thereof paid to the several persons entitled to share in the production from such separately-owned tract in the same manner, in the same proportions, and upon the same conditions that they would have participated and shared in the production of proceeds thereof from such separately-owned tract had not said unit been organized, and with the same legal force and effect." [5]

"Operations carried on under and in accordance with the plan of unitization shall be regarded and considered as a fulfillment of and compliance with all of the provisions, covenants, and conditions, express or implied, of the several oil and gas mining leases upon lands included with the unit area, or other contracts pertaining to the development thereof, insofar as said leases or other contracts may relate to the common source of supply or portion thereof included in the unit area. Wells drilled or operated on any part of the unit area no matter where located shall for all purposes be regarded as

3. 52 Okla.Stat. § 287.1 et seq.

4. 52 Okla.Stat. § 287.9, ¶1.

5. 52 Okla.Stat. § 287.9, ¶3.

wells drilled on each separately-owned tract within such unit area." [6]

The parties have stipulated that "neither the enactment of said statute nor the creation of said unit was contemplated by the parties to the First Agreement or the Second Agreement at the times said agreements were entered into."

Since unitization, defendant has accounted to plaintiffs by computing the 50% overriding royalty each month, according to the fraction of unit production allocated to each tract. From this 50% share, defendant has deducted each month the amount of the fixed per well deduction, according to paragraph 4(b) of the agreements, supra, as modified by the subsequent elimination of the additional $50 per month deduction for wells producing more than 10% water. Defendant continued the $200 deduction per month with respect to tracts on which wells had been abandoned under directions of the unit operating committee.

It is plaintiffs' contention that the fixed per well deduction clause should be reformed to provide for a deduction equal to one-half of allocated unit expense. This contention is based on the assertion that the parties contemplated competitive exploitation, and since unitization, this is no longer possible. Also, it is grounded on the assertion that the unitization statute nullified the provision for a fixed per well deduction. They contend further that the fixed per well deduction was unlawfully applied to tracts on which wells had been abandoned.

Defendant contends that the evidence does not justify reformation either on principles of equity or because of unitization. Further, defendant argues that the unitization statute requires the assumption that a producing well is located on every quarter-quarter section of land within the unit area, whether or not a producing well is actually located thereon.

The issues thus before us are (1) whether the two agreements should be reformed and (2) whether defendant's deductions with respect to the tracts on which wells had been abandoned was proper. The district court denied reformation and held such deductions were proper.

On July 29, 1947, pursuant to the Act, the Corporation Commission of Oklahoma, to which was committed jurisdiction to administer the Act, entered an order creating the West Edmond Hunton Lime Unit (the Order), defining the unit area and prescribing the Plan of Unitization applicable thereto (the Plan). The Plan became effective October 1, 1947 and has remained in force since that time with certain amendments not material in this case.

Schmitz and the Foxes joined in the petition for unitization. The Plan finally adopted by the Corporation Commission conformed to that proposed by petitioners. The Order was subject to challenge by appeal to the Supreme Court of Oklahoma, but no such appeal was filed.

The validity of the Act was upheld by the Oklahoma Supreme Court as a proper exercise of police power in Palmer Oil Corporation v. Phillips Petroleum Co., 204 Okl. 543, 231 P.2d 997 (1951). Appeal from that decision was dismissed by the Supreme Court of the United States for the reason that it "failed to raise any substantial federal questions." Palmer Oil Corp. v. Amerada Petroleum Corp., 343 U.S. 390, 391, 72 S.Ct. 842, 843, 96 L.Ed. 1022 (1952).

The Palmer holding was recognized in West Edmond Hunton Lime Unit v. Stanolind Oil & Gas Co., 10 Cir., 193 F.2d 818, 823 (1951), cert. denied 343 U.S. 920, 72 S.Ct. 678, 96 L.Ed. 1333 (1952). In the latter case, the Tenth Circuit considered and upheld the validity of the same Order and Plan before us in the instant appeal, although on another question of law not relevant to the instant case. A careful analysis of the Act, Order and Plan are to be found in that opinion and need not be repeated here. We are content to follow its teaching. In

---

6. 52 Okla.Stat. § 287.9, ¶ 4.

finding the effect of the Plan, the court said, *inter alia:*

> "The plan of unitization had the effect of unitizing all further development and operations for the production of oil and gas from the Hunton lime formation in the unit area, and of pooling and unitizing the production so obtained 'to the same extent as if the unit area had been included in a single lease and all rights thereunder owned by the lessees in individual interests', and all property rights and obligations in respect to the separately owned tracts within the area were amended and modified to the extent necessary to give effect to the plan of unitization. Nothing contained in the plan, however, is to be construed to require or result in a transfer to or the vesting in the unit the title to the separately owned tracts within the unit area 'other than the right to use and operate the same to the extent set out in this plan of unitization; nor shall the unit be regarded as owning any of the unit production. The unit production and the proceeds from the sale thereof shall be owned by the several persons to whom the same is allocated under this plan of unitization. * * * ' The unit is operated by a designated operator under the direction of an operating committee, composed of the separate tract owners, with a voting interest equal to the respective unit ownerships." Id., 193 F.2d at 821.

It is quite clear to us that the questions to be resolved on this appeal must be determined by the Act, Order and Plan as they are read into the private agreements executed by the parties.

## I.

Plaintiffs' basic contention is that "the compulsory unitization of the assigned tracts required the reformation of the agreements by the deletion of the monthly fixed per-well deduction and its replacement by an obligation to share one-half of the allocated expense."

We can find no basis for reformation of the agreements either on principles of equity or because of unitization.

There are no claims of mistake, fraud, misrepresentation or ambiguity in the terms of the agreements. Traditional equitable grounds for reformation are not present here.

Plaintiffs argue that the agreements were executed at a time when Oklahoma recognized the "law of capture" which rewards an aggressive competitor engaged in a permissible unbridled exploitation of the natural resources at his command.

However, Oklahoma has specifically held that the rule of capture is subject to modification by statute and must give way to unitization through which the State, in the exercise of its police power, undertakes to protect the correlative rights of owners of a common source of oil and gas through regulation of drilling and distribution of the production. Palmer Oil Corporation v. Phillips Petroleum Co., 204 Okl. 543, 231 P.2d 997, 1012 (1951); Patterson v. Stanolind Oil & Gas Co., 182 Okl. 155, 77 P.2d 83 (1938); H. F. Wilcox Oil & Gas Co. v. Bond, 173 Okl. 348, 48 P.2d 820 (1935).

The burden of plaintiffs' contention is that since, by operation of law, the rule of capture is abrogated through unitization, it necessarily follows that the conditions underlying their original agreements were made illegal and that it is no longer possible for defendants to perform their obligations. We do not agree.

We are not at all certain, as contended by plaintiffs, that the trial court erred in finding the agreements were not based on "competitive exploitation." Before unitization, the development of this field was at all times subject to the orders of the Corporation Commission of Oklahoma. Prior to the time the agreements were executed it had issued orders affecting spacing and production as herein earlier pointed out. Further, paragraph 5 of the agreement provides that no producing well shall be shut in unless pursuant to an order, rule or regulation of any officer, board or agency, state or federal.

Assuming, *arguendo,* that the trial court erred in such finding, we do not deem the finding to be necessary to the result reached.

The Plan determined the *quantity* of production to be shared by the owners of the unit. It did not change the *proportions* in which the parties were to share in the allocated production. Article VII of the Plan requires allocation of unit production among the separately owned tracts in the unit in accordance with their respective percentage interests. It then provides that the persons entitled to share in the separately owned tracts shall share in the unit production allocated exactly as they would have shared in the production from these tracts had there been no unitization.

The amount of the production to be distributed is thus to be determined by the Act and the Plan. The proportions in which the parties shall share in the production allocated to each separately owned tract are to be determined by the applicable private agreements between the various parties. Cf. Young v. West Edmond Hunton Lime Unit, 275 P.2d 304 (Okl.1954).

Relevant, also, is Article VI of the Plan which provides: "Property rights, leases, contracts and all other rights and obligations in respect of the Oil and Gas Rights in and to the several Separately Owned Tracts within the Unit Area are hereby amended and modified to the extent necessary to make the same conform to the provisions and requirements of this Plan of Unitization, *but otherwise to remain in full force and effect."* (Emphasis added.) This provision is consistent with Section 287.9, ¶ 1 of the Act, supra.

It seems clear to us that the Act and Plan, by operation of law, amended the agreements to the extent necessary to make them conform thereto, and then declared that otherwise the agreements should remain in full force and effect.

This conclusion is buttressed by the finding contained in paragraph 13 of the Order: " * * * that said Plan of Unitization is fair, reasonable and equi-table and contains all the terms, provisions, conditions and requirements reasonably necessary and proper to protect, safeguard and adjust the respective rights and obligations of the several persons affected, including royalty owners, owners of overriding royalty interests * * *."

Plaintiffs, in effect, are asking the court to make an adjustment or reformation not provided for in the Plan. This it cannot do under the circumstances of this case.

Plaintiffs argue that the trial court committed manifest error in finding that unitization was "expressly contemplated" in the agreements in the face of a stipulation to the contrary. A careful reading of the district court's full comment in that connection indicates to us that the court was referring to governmental regulation in general and not to unitization exclusively. In any event, under the Act, such a finding is immaterial and is not necessary to reach the result found in this case.

We hold that the applicable provisions of the Act, Order and Plan are clear and conclusive. They amended the agreements by operation of law to make them conform to their requirements and declared that otherwise the agreements should remain in full force and effect. The trial court did not err in refusing to reform the agreements by deleting the monthly fixed per well deduction and replacing it with an obligation to share one-half of the allocated expense.

II.

Plaintiffs finally contend, in the alternative, that "even in the absence of reformation of the agreements, plaintiffs are entitled to restitution of the deductions charged against tracts on which there were no producing wells," and charge that the trial court erred in denying such recovery.

Since 1951, defendant has taken the monthly per-well deduction in computing the overriding royalties on unit production allocated to 16 tracts on which wells were shut in and were no longer produc-

ing. Plaintiffs argue that the agreements do not permit the deduction except at such time as there is a producing well on a tract, and that since a shut in well does not incur operating expenses, plaintiffs should be relieved from their expense obligation with respect to such well.

Both Section 287.9 of the Act and Article VI of the Plan require the assumption that the amount of unit production allocated to a tract be considered as "production from" such tract, even though there is no well actually located on the tract, and the further assumption that a producing well is located on every tract. To repeat, the language of the Act provides: "Wells drilled or operated on any part of the unit area no matter where located shall for all purposes be regarded as wells drilled on each separately-owned tract within such unit area." [7]

The effect given here to the assumptions required by the Act and Plan is recognized in Beene v. Midstates Oil Corporation, 8 Cir., 169 F.2d 901, 908 (1948).

The parties dealt at arm's length in arriving at their agreements. The final form of the first agreement reflected changes to give Schmitz and the Foxes what they asked for, on the advice of their tax counsel—an overriding royalty entirely free of expense, but subject to the monthly specified per well deductions. This arrangement was incorporated in a second and similar agreement six months later covering additional leases. After operating under this arrangement for more than four years, they accepted defendant's offer to reduce to $200 per well the monthly deduction of $250 applicable to eight wells then producing more than 10% water.

■ In the case at bar, unitization provided that plaintiffs, as owners of an overriding royalty interest, were entitled to share in unit production allocated to all tracts, including those on which the wells had been abandoned. It necessarily follows that defendant should be entitled to continue the per well monthly deduction in respect of such abandoned shut in wells, in computing the amount of the overriding royalty, even though there be no production on tracts with these abandoned wells.

■ We do not deem relevant the argument advanced concerning the relative profits of the parties. The rights of parties fixed by contract are not governed by comparing their subsequent relative gains or losses. See West Edmond Hunton Lime Unit v. Stanolind Oil & Gas Co., 10 Cir., 193 F.2d 818, 825 (1951); Cities Service Oil Co. v. Geolograph Co., 208 Okl. 179, 254 P.2d 775 (1953).

The agreements are clear and unambiguous. They correctly express the original intention of the parties. The record of the testimony given and the provisions of the Act and Plan do not afford any rational basis for the restoration claimed. We hold that the trial court did not err in denying such recovery.

It is our considered judgment that the district court arrived at a correct result.

The judgment appealed from is

Affirmed.